**In re CHICKEN ANTITRUST LITIGATION.**

**Civ. A. No. C74–2454A.**

United States District Court,
N.D. Georgia,
Atlanta Division.

March 28, 1979.

## ORDER

O'KELLEY, District Judge.

Presently pending herein are (1) the motions of defendants Southeastern Hatcheries [hereinafter "Southeastern"] and H & H Poultry Company [hereinafter "H & H"] to strike the "most-favored-nations" clauses from all proposed settlement agreements herein and the related application of defendants Kane-Miller Corp., Bayshore Farms, Inc., Bayshore Foods, Inc., and Shorgood Poultry Distributors, Inc. for a declaratory ruling that they are entitled to a refund under the most-favored-nations clause of the Kane-Miller settlement agreement; (2) the joint motions of settling plaintiffs and settling defendants for certification and approval of settlement classes and for approval of the proposed forms of class notice; (3) the plaintiffs' motion for approval and certification of the Master Mailing List; (4) the application of defendants Perdue, Inc. and Perdue Farms, Inc. for approval of security; (5) the plaintiffs' motion to approve expenditures for notice costs; and (6) the special master's request for allowance of additional fees and expenses. Each of these matters will be considered *seriatim*.

### THE MOST–FAVORED–NATIONS CLAUSES

With some slight variations, the most-favored-nations clauses in all of the proposed settlement agreements in question herein are essentially the same.[1] They all provide that plaintiffs will not enter into a subsequent settlement with later settling defendants that is more favorable than they have reached with earlier settling defendants without paying the earlier settling defendants a refund equalizing the earlier and later settlements, as measured by the number of cents-per-pound of a fixed percentage of the total broiler production of each of the settling defendants or group thereof during the period in question, paid or to be paid by each of such settling defendants or group thereof. By protecting earlier settling defendants from the risk that they might be penalized for settling promptly, the most-favored-nations clauses were powerful catalysts for settlement in the case *sub judice*. In fact, it is quite possible that certain of the settling defendants would not have made commitments to settle for the large amounts involved herein but for the assurances offered by a most-favored-nations refund guaranty. However, notwithstanding the crucial role that they played in encouraging settlement, the most-favored-nations clauses also are the source of the serious difficulties that have been encountered in consummating the proposed settlements herein. The problems began when defendants Southeastern and H & H sought

---

1. Most, but not all, settling defendants herein have agreed to such clauses as a part of their proposed settlement agreements with plaintiffs.

the consent of certain earlier settling defendants to be exempted from the most-favored-nations clauses of the A.C. Smith and Hudson Foods settlement agreements on the ground that they each lacked the "financial ability" to settle for an amount equal to that paid by the earlier settling defendants, within the meaning of those clauses. When the requests of defendants Southeastern and H & H for exemption were met with the vigorous opposition of the earlier settling defendants rather than with their consent, defendants Southeastern and H & H filed motions for a declaratory ruling that in view of their relative "financial [in]ability" to settle for the amount specified in the most-favored-nations clauses in question, various earlier settling defendants were unreasonably withholding consent to their request to be exempted from such clauses, such that their proposed settlements with plaintiffs would not entitle such earlier settling defendants to a most-favored-nations refund. The earlier settling defendants in question opposed these motions not only on the basis that defendants Southeastern and H & H are financially able to settle for the most-favored-nations formula amount but also on several other grounds, most of which related to whether or not the motions presented the court with justiciable controversies. On June 30, 1978, the court found that questions concerning interpretation and application of the most-favored-nations clauses are manifestly within the ambit of the court's sweeping class settlement approval authority and, accordingly, proceeded to set the motions of defendants Southeastern and H & H for a hearing. After consideration of the evidence and arguments presented by counsel at the hearing on July 26, 1978, the court took these motions under advisement.

Thereafter, on August 22, 1978, the court was informed that in negotiating the settlements with defendants Perdue Farms, Inc. and Perdue, Inc., plaintiffs' counsel had forgotten that the most-favored-nations clause in the Allied Mills settlement agreement did not contain an "averaging" provision. As a result thereof, defendant Allied Mills apparently is entitled to a most-favored-nations refund claim in the amount of approximately $750,000.[2] At a conference convened at the court's request on that date, the court immediately informed counsel of its concerns (1) that the most-favored-nations clauses in the proposed settlement agreements herein may generate extensive additional litigation of alleged violations of such clauses and (2) that the uncertainty that they inject into any computation of the ultimate amount of settlement recovery may impair the court's ability to determine whether the proposed settlements are "fair, reasonable, and adequate." After long and arduous consideration of these developments,[3] on December 5, 1978, the court ordered all parties herein to show cause why the court should not refuse to approve any proposed settlements containing most-favored-nations clauses. Subsequently, at the December 20, 1978, show cause hearing, the court was informed by counsel for the plaintiffs that plaintiffs would be unable to settle with defendants Southeastern and H & H in the amounts previously agreed upon because, in view of plaintiffs' settlement with defendant Townsends, Inc. for less than 0.25 cents-per-pound, the most-favored-nations clause of the Hudson Foods settlement agreement would be triggered. Accordingly, because the most-favored-nations clause of the Hudson Foods settlement agreement was, in effect, blocking their settlement with plaintiffs, defendants

---

**2.** The consequences of a violation of the most-favored-nations clause in the Allied Mills settlement agreement are potentially far-reaching. It appears that if the Allied Mills most-favored-nations clause is enforced and defendant Allied Mills is permitted to obtain a refund of approximately $750,000, then such a reduction in the amount of the settlement with defendant Allied Mills arguably would trigger the most-favored-nations clauses in prior settlement agreements,

thereby entitling other settling defendants to a refund as well. For example, defendant Gold Kist has stated that, in that event, it would be entitled to a refund of approximately $119,-404.23. In addition, violation of the Allied Mills most-favored-nations clause raises serious questions of professional responsibility for plaintiffs' counsel.

**3.** *See* note 2 *supra.*

Southeastern and H & H filed motions to strike the most-favored-nations clauses from all prior settlement agreements herein as violative of public policy. Finally, since the December 20, 1978, show cause hearing, yet another most-favored-nations dispute has arisen. On January 4, 1979, defendants Kane-Miller Corp., Bayshore Foods, Inc., Bayshore Farms, Inc., and Shorgood Poultry Distributors, Inc. filed an application for a most-favored-nations refund based upon the Perdue settlement agreement. The applicant-defendants contend that by enabling the Perdue defendants to retain the use of their entire settlement payment for a substantial period of time,[4] the Perdue agreement is more favorable to settling defendants than the Kane-Miller agreement and, therefore, is in violation of the Kane-Miller most-favored-nations clause. It is in this context then that the court must consider whether to strike or to uphold the most-favored-nations clauses in the case *sub judice.*

Despite the admonition of the editors of the *Manual For Complex Litigation* that "the complications and even inequities which 'most favored nations' clauses almost always generate make their use undesirable" and that "absent extraordinary and very special circumstances, [they] should be avoided,"[5] certain settling defendants[6] note that most-favored-nations clauses similar to those in question in the case *sub judice* have been upheld or approved by implication in a variety of circumstances, including labor contracts,[7] patent-licensing agreements,[8] and even other antitrust settlement agreements.[9] Furthermore, such defendants have proposed a "solution" to the two concerns that the court articulated

to counsel. They contend that by merely requiring that all most-favored-nations refund claims be asserted now, in an amount certain, or be forever barred, the court could be assured that no additional litigation of most-favored-nations claims would be generated from these settlements and that the amount paid into the settlement fund would be the ultimate amount of settlement recovery. Accordingly, because the most-favored-nations clauses were bargained for, the settling defendants in question strongly urge the court to allow them to be enforced, where appropriate, pursuant to some reasonably defined timetable.

Contrariwise, defendants Southeastern and H & H contend that all most-favored-nations clauses in the proposed settlement agreements herein should be stricken on public policy grounds. Specifically, these defendants argue that insofar as they require plaintiffs to settle with economically weaker defendants on terms equal to those previously negotiated with economically stronger defendants, they unduly restrict the plaintiffs' freedom of action in subsequent bargaining and, therefore, are anti-competitive. Similar clauses that had been agreed to in a union-employer bargaining setting were struck down for this reason by the United States Supreme Court in *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965):

From the viewpoint of antitrust policy, moreover, all such agreements between a group of employers and a union that the union will seek specified labor standards outside the bargaining unit suffer from a more basic defect, *without regard to predatory intention or effect in the particular case. For the salient characteris-*

---

4. The interest value of the use of the settlement payment for the time period in question can easily be translated into cents-per-pound of the fixed percentage of the broiler production in question.

5. 1977 *Manual For Complex Litigation* § 1.46 at 62–64.

6. As might be expected, the most zealous advocate of upholding the most-favored-nations clauses herein is defendant Allied Mills.

7. *See, e.g., Associated Milk Dealers, Inc. v. Milk Drivers Union, Local 753,* 422 F.2d 546, 553–54 (7th Cir.1970).

8. *See, e.g., Shatterproof Glass Corp. v. Libbey-Owens-Ford Co.,* 482 F.2d 317, 319–24 (6th Cir.1973), *cert. denied,* 415 U.S. 918, 94 S.Ct. 1417, 35 L.Ed.2d 473 (1974).

9. *See* 3 H. Newberg, *Class Actions,* § 5620a at 509–10 n. 8–9 (1977).

*tic of such agreements is that the union surrenders its freedom of action with respect to its bargaining policy.* Prior to the agreement the union might seek uniform standards in its own self-interest but would be required to assess in each case the probable costs and gains of a strike or other collective action to that end and thus might conclude that the objective of uniform standards should temporarily give way. *After the agreement the union's interest would be bound in each case to that of the favored employer group. It is just such restraints upon the freedom of economic units to act according to their own choice and discretion that run counter to antitrust policy.*

(Emphasis added.) *Pennington, supra* at 668, 85 S.Ct. at 1592.[10] Thus, while it certainly appears to be in the plaintiffs' best interests in the case *sub judice* to settle with defendants Southeastern and H & H for the amounts originally agreed upon rather than be forced to go to trial against them as the lone non-settling defendants, like the union in *Pennington*,[11] plaintiffs herein have, in effect, lost the freedom to act in their own self-interests in accordance with changing bargaining situations.[12] Because plaintiffs are "strait-jacketed" by their most-favored-nations agreements with certain prior settling defendants, the strong public policies favoring complete settlement of litigation of this type are being frustrated.

Insofar as it would prohibit a group of economically stronger units from imposing a minimum settlement scale on their economically weaker competitors, *Pennington* is applicable to the case *sub judice* in another, more significant respect.[13] Specifically, the court is referring to the quandary of defendants Southeastern and H & H for whom enforcement of these clauses holds potentially devastating consequences. The evidence adduced at the July 26, 1978, hearing demonstrated that they are both marginal producers and that neither can afford to settle at the most-favored-nations formula price without considerable peril of financial collapse.[14] Yet by refusing to consent to exempt them from the most-favored-nations clauses, for "financial [in]ability," certain of their economically stronger competitors are imposing an untenable choice upon

10. Despite this broad language in Mr. Justice White's opinion, courts have not read *Pennington* to mean that most-favored-nations clauses are invalid per se. Rather, they have found that under the actual holding of *Pennington,* in order to strike down such clauses, there must be some proof of predatory purpose. *See, e.g., Associated Milk Dealers, Inc. v. Milk Drivers Union, Local 753,* 422 F.2d 546, 553 (7th Cir. 1970). *But see* text at note 16 *infra.*

11. Certain settling defendants argue that the *Pennington* decision is totally inapposite to the case *sub judice* because the contractual clauses involved therein expressly prohibited one of the parties to the contract from freely negotiating with competitors of the other party, whereas the most-favored-nations clauses herein do not expressly prohibit plaintiffs from negotiating subsequent settlement agreements in any amount. They merely require recomputation of the protected parties' settlement obligation if subsequent more favorable settlements are reached. In the court's view, however, insofar as any triggering of the clauses herein would substantially reduce the plaintiffs' settlement recovery, such clauses do have the effect of prohibiting plaintiffs from entering into settlements for amounts less than the most-favored-

nations formula price, and, therefore, they are similarly objectionable.

12. Although under the present circumstances herein the most-favored-nations clauses may be operating to plaintiffs' detriment in many respects, presumably because they are contractually bound to abide by them, they have refrained from filing any memoranda in support of the motions of defendants Southeastern and H & H.

13. In *Pennington* a group of employers sought to impose a minimum wage scale on all other employers in the industry by agreement with the union.

14. After careful evaluation of the financial data submitted by both Southeastern and H & H, the court concludes that payment at the most-favored-nations formula price would be an extreme hardship for both. However, the court does not expressly decide today whether either or both of these defendants lack the "financial ability" to settle at the most-favored-nations formula price, such that they should be exempted from the most-favored-nations clauses.

them—either pay at the most-favored-nations formula price or bear the enormous litigation costs that would be incurred in defending this litigation (as well as the risk of full-scale liability) as the lone non-settling defendants. The end result under either alternative may well be the elimination of defendants Southeastern and H & H from the marketplace.[15] Further, it appears that certain economically weaker early-settling defendants herein were "carried" by certain of the economically stronger early-settling defendants as part of various group settlement arrangements.[16] The fact that a combination of settling defendants, some of which were permitted to settle individually for less than the favored-nations formula amount, are withholding their consent to the requests of Southeastern and H & H to be exempted from the most-favored-nations clauses for "financial [in]ability" is strongly suggestive of predatory intent.

Finally, aside from the foregoing policy considerations, the court is not persuaded that the settling defendants who are seeking enforcement of the most-favored-nations clauses have offered a viable "solution" to the court's concerns that the most-favored-nations clauses may generate extensive additional litigation and that any settlement amount approved by this court may not be the ultimate amount of settlement recovery. The court is in agreement with defendants Southeastern and H & H that questions concerning the accuracy of the broiler production figures reported by certain settling defendants are likely to arise after any reasonable time period for asserting most-favored-nations claims which might be established by the court has expired and/or long after this litigation has terminated. In that event, at a minimum, there would be a necessity to litigate whether expiration of the most-favored-nations claims period was tolled by any alleged false reporting or fraudulent concealment. Certainly, any finding of fraud in connection with the production figures would entitle one or more settling defendants to a contractual claim for a most-favored-nations refund. As the court noted earlier, payment of just one most-favored-nations refund claim under such circumstances would threaten the integrity of the entire settlement.[17] This court cannot, in good conscience, approve any proposed settlements that are laden with such a potential for collapse months or even years from now. Therefore, the court hereby declares that it will not approve any proposed settlement agreements herein which contain most-favored-nations clauses.

Although, by refusing to approve any proposed settlement agreements containing most-favored-nations clauses, the court is ruling against the clear intent of the parties in question, all affected parties are completely free to renegotiate. Thus, no party can be heard to say that it will be prejudiced by today's decision. However, because most of the intended benefits of the most-favored-nations clauses have already been derived,[18] the court is confident that elimination of the most-favored-nations clauses from these agreements will not cause this litigation to revert to its pre-settlement posture and that all parties will

---

15. Of course, if the court ruled that defendants Southeastern and H & H should be exempted from the operation of the most-favored-nations clauses for "financial [in]ability," presumably all potential predatory effects from enforcement of the clauses would be vitiated.

16. Specifically, while some members of the A.C. Smith settlement group herein individually paid less than 0.25 cents-per-pound, the most-favored-nations clause in the A.C. Smith agreement requires defendants H & H and Southeastern to contribute the full formula amount.

17. *See* note 2 *supra*.

18. The plaintiffs benefited from the most-favored-nations clauses because each most-favored-nations settlement established a floor from which all later settlements had to be negotiated upward rather than downward. The defendants benefited from the most-favored-nations clauses because no later settling defendant obtained a more favorable settlement except by inadvertence or by reason of the precarious financial condition of certain defendants.

choose to abide by their proposed agreements as altered by the court.[19]

For the above reasons, the motions of defendants Southeastern and H & H to strike the most-favored-nations clauses from all proposed settlement agreements herein should be and are hereby granted, and the application of defendants Kane-Miller Corp., Bayshore Farms, Inc., Bayshore Foods, Inc., and Shorgood Poultry Distributors, Inc. for a declaratory ruling that they are entitled to a refund under the most-favored-nations clause of the Kane-Miller settlement agreement should be and is hereby denied as moot.

## DEFINITION AND CERTIFICATION OF SETTLEMENT CLASSES AND FORM OF CLASS NOTICE

Joint motions for definition and certification of settlement classes and for approval of proposed forms of class notice were originally filed herein on December 12, 1977, and on December 30, 1977, respectively. Since that time, however, certain disputes relating to the definition of settlement classes and to the form of class notice have developed between the plaintiffs and settling defendants, as reflected by plaintiffs' motion of December 7, 1978, and by the various responses thereto filed by settling defendants. Three principal disputed issues can be identified: (1) should settling defendants and/or their affiliates and/or subsidiaries be permitted to file claims as members of the catchall-direct purchaser class designated as plaintiffs' settlement Class V; (2) should the plaintiffs' settlement classes be defined to include purchasers of "chickens of any age," or should they be limited to purchasers of "chickens 6–13 weeks of age";

and (3) should plaintiffs State of New Jersey and Commonwealth of Massachusetts be permitted to note their representational status under state law on behalf of their respective political subdivisions and public agencies in the settlement notice to the classes.

### I.

Section E of plaintiffs' most recently proposed form of notice includes the following language:

No settling defendant shall be permitted or entitled to file a proof of claim herein and to participate in any share or distribution of any portion of the settlement fund.

The settling defendants object to inclusion of the foregoing language on the ground that they and their subsidiaries and/or affiliates are not expressly excluded from membership in settlement Class V and, therefore, they should be permitted to participate as claimants thereunder. Settlement Class V is defined to include all persons who are not members of settlement Classes I–IV [20] but who purchased broilers during the time period in question

directly from any defendant in the cases in this multi-district litigation or from any other person, firm, entity, or other organization which slaughtered and processed Broilers, or any affiliate thereof.

The settling defendants argue that in formulating Class V it was the clear intent of the parties to include therein *all* direct purchasers of broilers, whether or not identified at the time of the settlement, who did not fall within settlement Classes I–IV but who, nevertheless, were potential plaintiffs under section 4 of the Clayton Act.[21] Only by devising such a comprehensive subclass

---

**19.** At the December 20, 1978, show cause hearing the court was informed by counsel herein that all parties in question had tentatively agreed among themselves to be bound by the court's ruling on the most-favored-nations issue and that no renegotiation would ensue from a ruling that the court would not approve any proposed settlement agreements containing most-favored-nations clauses. However, the court's knowledge of this tentative agreement was not determinative of today's decision.

**20.** Classes I–IV divide the plaintiffs into settlement classes as follows: governmental entities [Class I]; supermarkets [Class II]; hotels, motels, restaurants, fast food establishments, and institutional feeders [Class III]; and wholesalers and distributors [Class IV].

**21.** Unlike settlement Class IV, which expressly excludes defendants, and settlement Class III, which expressly excludes both defendants and their subsidiaries and affiliates, Class V expressly excludes neither defendants, their affili-

could the defendants be assured of obtaining "total peace" in consideration for their massive settlement payments. Thus, the settling defendants contend that if other settling defendants and/or their subsidiaries and/or affiliates who are direct-purchaser claimants are prohibited from participating in this litigation under Class V, then such claimants may elect to file separate lawsuits. In such event, settling defendants will have additional exposure and will be deprived of the "total peace" which they bargained for. Contrariwise, plaintiffs contend that it was never intended by the parties to any of the proposed settlement agreements herein that defendants, or their affiliates or subsidiaries, would be included in Class V.[22] They argue (1) that "direct purchasers" as defined by the United States Supreme Court in *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1970), cannot include defendants, their affiliates, or their subsidiaries;[23] (2) that even if the affiliates and/or subsidiaries are "direct purchasers" entitled to sue, they would be barred from recovery under the doctrine of *in pari delicto;*[24] and (3) that to allow defendants, their affiliates, or their

---

ates, nor their subsidiaries. Therefore, defendants contend that the agreed-to language is clear and unambiguous on its face that defendants, their affiliates, and subsidiaries are potential members of Class V. However, in an apparent attempt to absolve themselves from their carelessness, plaintiffs argue that the express exclusions from Classes III and IV should be "implied" in Class V. The court is in agreement with defendants that this argument is self-contradictory since exclusion from Classes III and IV is an express precondition for membership in Class V.

22. In support of this contention, plaintiffs have filed the affidavit of Mr. David A. Shapiro, one of the attorneys representing plaintiffs who negotiated the first major settlement with counsel for certain defendants herein. In his affidavit Mr. Shapiro states (1) that upon learning of the decision of the United States Supreme Court in *Illinois Brick,* during a negotiating session on June 9, 1977, defense counsel expressed to him their concern about obtaining "peace" from pet food and soup manufacturers who purchased chickens directly from processors for commercial and industrial use; (2) that, accordingly, defense attorney James Rill drafted a new class of "direct purchasers" for the purpose of including the aforementioned industrial and commercial users in the proposed settlement; (3) that this draft, with minor modifications, is the present definition of Class V; and (4) that during a telephone conversation with Mr. Rill on December 20, 1978, Mr. Rill stated to him that in drafting the Class V definition "he had no intention of creating a class which would include defendants or their affiliates, or which would serve as a basis for either defendants or their affiliates to file claims against the settlement fund."

23. Specifically, plaintiffs argue that *Illinois Brick* should be read to hold that it is only the "overcharged" direct purchaser and not others in the chain of distribution who are "injured in his business or property" within the meaning of section 4 of the Clayton Act. Thus, plaintiffs reason that defendants cannot be "overcharged" direct purchasers because, as members of the conspiratorial group, any excessive payments they make for direct purchases from a co-defendant or its affiliate or subsidiary are amply compensated by the illicit profits that they are reaping from the conspiracy. Under the same reasoning, subsidiaries or affiliates of the defendants cannot be "overcharged" direct purchasers. Otherwise, a defendant could immunize itself from liability under the antitrust laws by simply selling to its subsidiary or affiliate first and then to non-controlled "indirect" purchasers. Certainly, the direct-purchaser rule was not intended to provide putative antitrust defendants with a shield from antitrust liability. *See Illinois v. Illinois Brick Co.,* 431 U.S. 720, 736 n. 16, 97 S.Ct. 2061, 2070 n. 16, 52 L.Ed.2d 707 (1970); *Stotter v. Amstar Corp.,* 579 F.2d 13 (3d Cir.1978). *See* text at note 27 *infra.*

24. In *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), the United States Supreme Court found nothing in the language of the antitrust laws indicating a congressional intent that the doctrine of *in pari delicto* should constitute a defense to a private antitrust action. Accordingly, the Court held that those who merely acquiesce or otherwise agree to illegal price-fixing are not barred from seeking recovery from the alleged violators of the antitrust laws. Plaintiffs argue that, despite this decision, the doctrine of *in pari delicto* has not been completely expunged from the private relief provisions of the antitrust laws and that it remains applicable to prevent direct participants in an unlawful conspiracy from recovering from their co-conspirators. *See, e.g., Javelin Corp. v. Uniroyal,* 546 F.2d 276 (9th Cir. 1976), *cert. denied,* 431 U.S. 938, 97 S.Ct. 2651, 53 L.Ed.2d 256 (1977); *Kestenbaum v. Falstaff Brewing Corp.,* 514 F.2d 690, 695 (5th Cir. 1975), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1412, 47 L.Ed.2d 349 (1976).

subsidiaries to obtain a windfall settlement recovery through the "back door" would be contrary to the strong public policy considerations discussed by the Court in *Illinois Brick Co., supra,* and as reflected by rule 23 of the Federal Rules of Civil Procedure.[25]

 Without directly adjudicating the issue of the intent of the parties in question in providing for settlement Class V,[26] the court concludes that certain overriding public policy considerations identified by the plaintiffs[27] should govern resolution of this issue. To permit the defendants, their subsidiaries, or their affiliates to recover for purchases from each other would be inconsistent with the policies underlying the direct-purchaser rule.[28] Similarly, to allow the defendants and their subsidiaries and affiliates, which are not legally autonomous, to participate as claimants under settlement Class V would be contrary to rules 23(a)(3) and 23(a)(4) of the Federal Rules of Civil Procedure.[29] Because they have vigorously contested plaintiffs' allegations of unlawful conduct, the interests of the settling defendants are patently antagonistic to other class members. Despite these overriding policy considerations, however, some accommodations must be made to uphold the intent of the parties where possible and in particular where settling defendants specifically bargained for the right of their subsidiaries and/or affiliates to participate as claimants under one of plaintiffs' settlement classes.[30] Accordingly, the court concludes that:

(1) all named party defendants, their affiliates, and subsidiaries, to the extent that they are not legally independent and autonomous from their parent-defendant or affiliate-defendant, shall be excluded from participating as claimants under any of the settlement classes herein;

(2) all legally independent and autonomous subsidiaries and/or affiliates of all named defendants herein not expressly excluded from settlement Classes I–IV may participate as either direct purchaser claimants under settlement Class V or as wholesaler-distributor claimants under settlement Class IV as appropriate whether or not they are controlled or owned in whole or in part by their parent-defendant or affiliate-defendant;

(3) no legally independent and autonomous subsidiaries and/or affiliates of all named defendants herein who are permitted to participate as claimants in these settlements under part (2) *supra* shall be permitted to recover for purchases from their parent-defendant or affiliate-defendant.

The court believes that the foregoing is harmonious with the applicable public policy considerations yet at the same time generally consistent with the intent of the parties.

## II.

 The issue of whether the proposed settlements herein cover only claims arising

25. *See* notes 28 and 29 *infra* and accompanying text.

26. *But see* note 30 *infra* and accompanying text. Further, the court notes that it is inclined to agree with defendants that the language in question is clear on its face. *See* note 21 *supra.*

27. The policy considerations underlying the *in pari delicto* doctrine are not among those upon which the court is basing its decision. The court is not in agreement with plaintiffs' policy argument that the *in pari delicto* doctrine is applicable to the case *sub judice.* A fortiori, this argument is premised upon the assumption that the settling defendants herein were participants in some wrongdoing. However, all of the proposed settlement agreements herein were reached with the stipulation that settling defendants were not in any way acknowledging

fault or liability. Settling defendants expressly denied participation in any wrongdoing.

28. *See* note 23 *supra.*

29. Rules 23(a)(3) and 23(a)(4) of the Federal Rules of Civil Procedure set forth the "typicality" and "adequacy of representation" requirements for class treatment.

30. Shorgood Poultry Distributors, Inc., a subsidiary of defendant Kane-Miller, was originally named as a defendant in this litigation. However, as part of the Kane-Miller settlement agreement, plaintiffs dismissed all actions herein as against Shorgood to permit Shorgood to participate in these settlements as a claimant under settlement Class IV—the wholesaler-distributor class.

from purchases of "chickens 6–13 weeks old" or whether they cover claims arising from purchases of "chickens of any age" arises from variances that exist among the various proposed settlement agreements in the language used to define "broilers." In eleven of thirteen proposed settlement agreements [31] "broilers" are defined as

chickens that have been grown for a period of 6–13 weeks and then slaughtered and processed for sale to customers whole or cut-up in any form in any stage of processing . . . .

This same definition of "broilers" is incorporated in the release and covenant-not-to-sue provisions of these proposed settlement agreements. Contrariwise, in the proposed Kane-Miller and Heublein settlement agreements [32] "broilers" are defined to extend to "chickens of any age":

The term "broilers" as used in this Agreement means chickens of any age that have been slaughtered and processed for sale to customers, in any form, in any state or processing . . . .

However, this precise definition is not incorporated in the release and covenant-not-to-sue provisions of the proposed Heublein and Kane-Miller settlement agreements. Rather, those provisions define the plaintiffs' claims that are being released and that are covered by the covenants-not-to-sue as

claims . . . which arise from, are connected with, or related to or based upon, in whole or in part, any facts, matters, claims or transactions expressly or im-

pliedly alleged, set forth, or referred to in the complaints in the Listed Cases.
(Emphasis added.)

Because the complaints in the "Listed Cases" uniformly defined "broilers" as "chickens 8–13 weeks of age," [33] plaintiffs argue that this definition of broilers governs the proposed Kane-Miller and Heublein agreements. Contrariwise, defendants contend that because claims by purchasers of chickens that were other than 8–13 weeks of age necessarily "arise from, are connected with, or are related to or based upon" purchases of "broilers," the "chickens of any age" definition clearly governs the scope of the proposed Kane-Miller and Heublein settlement agreements. Further, they argue that in the original joint motion for approval of the proposed forms of class notice filed on December 30, 1977, plaintiffs agreed to use of the broader Kane-Miller and Heublein "chickens of any age" definition for purposes of defining the settlement classes as a method of simplifying the administration of these proposed settlements and, therefore, they should be bound by that agreement.[34] In response, plaintiffs note that the joint motion of December 30, 1977, expressly provided that "in submitting these proposed forms, the parties do not intend to alter or affect any substantive rights" under the proposed settlement agreements. Thus, they argue that because use of the broader definition would have a significant impact upon substantive rights, they are not bound by their agreement with defendants of December 30, 1977.[35] They

---

**31.** These eleven agreements govern approximately 33 of the remaining defendants.

**32.** These settlement agreements govern defendants Heublein, Inc., Kane-Miller Corp., Bayshore Foods, Inc., and Bayshore Farms, Inc.

**33.** However, there were some minor variances. The City of New York complaint defined broilers as chickens 8–10 weeks of age, and Alabama defined them as chickens 9–13 weeks of age.

**34.** See also text at note 37 infra.

**35.** Specifically, in their December 7, 1978, memorandum on this issue plaintiffs state that:

"Upon reflection, however, Plaintiffs have concluded that their concession to defendants at this point was in error, since it involved not merely a matter of procedural convenience, but constituted a substantial departure from the terms of the Settlement Agreements. Use of the term 'chickens of any age' rather than the narrower definition of broilers as 'chickens 6–13 weeks of age' would have the effect of expanding membership in the class and the scope of the claims being released by the plaintiffs and members of the class far beyond that contemplated in the complaints and the Settlement Agreements, would dilute the value of the settlements to purchasers of broilers (who are the only persons injured by the defendants' conspiracy) and would compensate purchasers

submit that the releases which cover only claims for purchases of the products as defined in the complaints—chickens 8–13 weeks of age[36]—give settling defendants all to which they are entitled.

Notwithstanding plaintiffs' reliance on the express reservation[37] in the joint motion for approval of proposed forms of notice of December 30, 1977, the court notes that, without reservation, plaintiffs joined in the December 12, 1977, motion for approval of proposed forms of class notice. That motion asked the court to approve the same "chickens of any age" class definition that was incorporated in the December 30, 1977, motion. At the time these motions were filed, plaintiffs recognized, or certainly should have recognized, that use of the "chickens of any age" definition would involve a considerable expansion in the scope of these proposed settlements. Yet, thereafter, plaintiffs sought and obtained court approval to gather the names of all identifiable members of the proposed settlement classes and to expend settlement funds for that purpose.[38] As a result thereof, the Settlement Administration Committee, with the assistance of plaintiffs and settling defendants, proceeded to identify and collect the names of all direct purchasers of "chickens of any age." In light of the considerable efforts and expenses that have been incurred in this process, the court is in agreement with defendants that the plaintiffs should not be permitted to renege on their agreement at this late date. Although expansion of the scope of these settlements to include "chickens of any age" may result in some dilution of the value[39]

of the settlement to purchasers of "broilers" (i.e., chickens 6–13 weeks or thereabouts, otherwise referred to as "young chicken"), the court believes that use of the "chickens of any age" definition should be used for a variety of reasons. First, preserving distinctions in the scope of the class of purchasers herein would result in unnecessary class notice expenses and could cause confusion to putative class members receiving class settlement notice. Second, such distinctions certainly would create great difficulties for claims administrators. Substantial increases in the cost of settlement administration would most assuredly result from these difficulties.[40] In all likelihood such cost increases would exceed any potential reduction in the value of this settlement to purchasers of broilers that might result from expansion of the scope of the settlement classes. Finally, use of a uniform "chickens of any age" definition in these settlements would effectively prevent direct purchasers of "spent hens" or of other "non-broiler" chicken products during the time period in question from bringing additional lawsuits and, therefore, would promote the strong public policies favoring complete settlement of all possible claims which could arise out of the transactions or events pleaded in the complaints in question herein under section 4 of the Clayton Act.[41] For the above reasons, the court hereby declares that it will not approve any proposed settlements herein that do not contain a uniform settlement class definition of plaintiffs as purchasers of "chickens of any age."

of 'spent hens' who may not have been injured."

**36.** See note 33 supra.

**37.** See text at note 34 supra.

**38.** See order of March 10, 1978.

**39.** See note 35 supra. The court notes, however, that in all probability any dilution in the value of the settlement will be slight. Specifically, in their memorandum of December 18, 1978, defendants represent that current United States Department of Agriculture statistics indicate that chicken other than "young chicken"

amounted to 9 percent or less of the total chicken production during 1970–76.

**40.** It appears that claims administrators would be confronted with the hopeless task of determining the age of various chickens that were purchased as long as ten years ago.

**41.** The court is in agreement with defendants that claims on behalf of direct purchasers of "chickens of any age" necessarily "arise from, are connected with, or are related to or based upon" the transactions or events pleaded in the complaints in question herein. See text at note 33 supra.

### III.

Section C(1) of plaintiffs' proposed forms of notice describes subclasses (9) and (12) of the governmental entities class [settlement Class I] as follows:

(9) The Commonwealth of Massachusetts, for itself and on behalf of all political subdivisions and public agencies in the Commonwealth of Massachusetts, pursuant to Massachusetts General Statutes, Ch. 13 § 10 and Rule 23 of the Federal Rules of Civil Procedure.

(12) The State of New Jersey, for itself and on behalf of all political subdivisions and public agencies in the State of New Jersey, pursuant to Section 12(b) of the New Jersey Antitrust Act (N.J.S.A § 56:9–12(b)) and Rule 23 of the Federal Rules of Civil Procedure.

Also included on page 22 of plaintiffs' proposed forms of notice is the following footnote:

Political subdivisions and agencies of the State of New Jersey may not elect to exclude themselves from this settlement without obtaining the approval of the Attorney General of New Jersey as provided by New Jersey Statutes Ann. § 56:9–12(b).

The settling defendants oppose introduction of the foregoing language in the proposed form of class settlement notice because the proposed settlement agreements herein were specifically entered into under the provisions of rule 23 of the Federal Rules of Civil Procedure and not pursuant to any applicable state law of representation.[42] Defendants submit that to avoid unnecessary confusion, the settlement notice to the governmental entities class should provide for the same subclass definition of the

states of New Jersey and Massachusetts as for all other states, as agreed to in the joint motion for certification and definition of settlement classes of December 12, 1977. Contrariwise, plaintiffs note that although they agreed to allow settlement notice to be directed to the political subdivisions in question solely for the purpose of assuring settling defendants that no such political subdivision could ever assert its ignorance of these proposed settlements, the proposed settlement agreements herein expressly provided that their acceptance of the proposed settlements did not waive any rights or powers governing the relationship between plaintiffs and such political subdivisions.[43] Therefore, they argue that the class notice would be inaccurate and misleading if it failed to advise all putative class members of the representational status of plaintiffs State of New Jersey and Commonwealth of Massachusetts under state law.

■ The issue of the rights of plaintiffs State of New Jersey and Commonwealth of Massachusetts to represent their political subdivisions herein under state law has been previously adjudicated by this court. Based upon the decision of the Court of Appeals for the Fifth Circuit in *Florida ex rel. Shevin v. Exxon Corp.,* 526 F.2d 266 (5th Cir.1976), that the Florida Attorney General has the authority to bring an antitrust action for damages and other relief on behalf of the state, its departments, agencies, and political subdivisions, without their explicit authorization and without their being named as parties to the lawsuit, the court found that the State of New Jersey had the power to initiate an antitrust action on behalf of all of its independent governmental subunits pursuant to N.J.S.A. 56:9–

---

**42.** The proposed settlement agreements herein expressly provide that they are "subject to the approval of the Court pursuant to the provisions of Rule 23(e) of the Federal Rules of Civil Procedure."

**43.** Specifically, the following language was included in the proposed settlement agreements herein:

"Notwithstanding the fact that the notice called for in this Settlement Agreement shall be provided to all public entities and political sub-

divisions within the State of New Jersey and the Commonwealth of Massachusetts, neither the fact of such notice nor the acceptance of such Agreement shall constitute a waiver of any right or power of the respective Attorneys General to enjoin or otherwise prohibit their respective public entities and political subdivisions from opting out of any class or otherwise excluding themselves from participating in this Settlement."

12(b).[44] In a subsequent order the court approved the representative status of the Commonwealth of Massachusetts on behalf of all of its subdivisions.[45] Although the non-waiver provision [46] of the proposed settlement agreements does not convert these proposed rule 23 settlements to settlements pursuant to state law, in light of these prior rulings, the court is in agreement with plaintiffs that the class notice would be inaccurate and misleading without reference to the representative status of the State of New Jersey and of the Commonwealth of Massachusetts. Contrariwise, insofar as footnote 22 expressly prohibits all political subdivisions and agencies of the State of New Jersey from opting out of these settlements, it is inappropriate. Omission of such language would not amount to a "massive interference" with state sovereignty as plaintiffs suggest. On the contrary, inclusion of such language in the class notice could be construed as a pre-determination of rights which may or may not exist under state law. For the above reasons, the court hereby declares that the class notice should disclose rights of representation that exist under state law but should not expressly restrict putative class members from taking any course of action with respect to these proposed settlements.

Subject to compliance with the foregoing rulings, the motions for class definition and certification and for approval of the proposed forms of class notice should be and are hereby granted.

## CERTIFICATION OF MASTER MAILING LIST

■ On July 21, 1978, the Settlement Administration Committee filed a "Supplemental Report Concerning the Methodology Employed to Compile the Master Mailing List." Said report, together with the numerous supporting documents and exhibits attached thereto, details the sources of information and the methods that were relied upon in identifying all putative class members, as well as the procedures that were followed in assembling the names and addresses of all such identifiable putative class members into a Master Mailing List. After completion of the methods and procedures described in said report, on November 20, 1978, plaintiffs filed a motion for certification and approval of the Master Mailing List. Plaintiffs' motion is supported by the affidavit of Arthur J. Galligan, Chairman of the Settlement Administration Committee, and by numerous exhibits annexed thereto. After careful review and consideration thereof, the court concludes that "a reasonable effort" has been made to identify all putative class members to whom individual notice should be sent, as required by rule 23(c)(2) of the Federal Rules of Civil Procedure. The court finds further that the proposal to publish the class notice in the publications set forth at page 10 of the affidavit of Arthur J. Galligan [hereinafter "the proposal"], together with individual mailed notices to all identifiable putative class members as contained in the Master Mailing List, will provide the "best notice practicable under the circumstances," in accordance with rule 23(c)(2) of the Federal Rules of Civil Procedure. Therefore, there being no objections of record to modification of the court's order of March 9, 1978, to allow expenditures for notice by publication in excess of $30,000 in accordance with "the proposal," the court hereby authorizes the Settlement Administration Committee to expend such funds in excess of $30,000 as may be necessary and appropriate to implement "the proposal" for notice by publication. For the above reasons, the plaintiffs' motion for certification of the methodology employed to obtain the Master Mailing List and for approval of the proposal should be and is hereby granted.

44. *See State of New Jersey v. National Broiler Marketing Association,* Civil No. C75–362A (Dec. 30, 1976).

45. *See* order of July 14, 1977.

46. *See* note 43 *supra.*

## PERDUE DEFENDANTS' APPLICATION FOR APPROVAL OF SECURITY

■ Defendants Perdue, Inc. and Perdue Farms, Inc. request the court to approve the following as reasonable security:

As reflected in the audited consolidated financial statements of Perdue Farms Incorporated dated as of April 2, 1978, prepared by Price Waterhouse & Co., Baltimore, Maryland, Perdue's net worth is sufficient to obtain such credit as would be necessary to satisfy Perdue's obligation pursuant to the Settlement Agreement and, therefore, no further security should be required from Perdue.

After careful review and consideration of the audited consolidated financial statements of defendant Perdue Farms, Inc. and its subsidiaries as of April 2, 1978, the court concludes that inasmuch as there is no opposition to the application of the Perdue defendants for approval of security, it should be and is hereby granted.

## MOTION FOR EXPENDITURE OF NOTICE COSTS

■ After careful review and consideration of plaintiffs' July 21, 1978, motion to approve the expenditure of a $15,000 retainer for the services of Philip Zeidman, Esquire, and the supplemental affidavits in support thereof of November 15, 1978, the court concludes that the contract price for Mr. Zeidman's services is fair and reasonable under the circumstances. Therefore, while the court reserves deciding today whether, considering the nature of the services performed, they are appropriately designated "costs of notice" rather than "special attorney's fees," [47] because the motion otherwise appears to be meritorious and is unopposed, the court hereby authorizes the Settlement Administration Committee to disburse to Mr. Zeidman $15,000 from such funds currently available to the Committee.[48]

## SPECIAL MASTER'S REQUEST FOR ALLOWANCE OF ADDITIONAL FEES

■ After careful review of the October 20, 1978, request of the special master for allowance of additional fees and expenses and of the itemized statement of services attached thereto, the court finds that said fees and expenses are fair and reasonable under the circumstances. Therefore, because the special master's request for allowance of additional fees is unopposed, it should be and is hereby granted. Because it appears that the $20,000 fund that was established for compensation of the special master has now been exhausted, additional funds must be obtained. Equal allocation of these fees and expenses between plaintiffs and defendants appears appropriate. Accordingly, the Settlement Administration Committee and defendants are each hereby authorized and directed to disburse $1,427.72 to the special master as compensation for his time and expenses from May 19, 1977, to September 19, 1978, on or before May 14, 1979.

In summary, the motions of defendants Southeastern and H & H to strike the most-favored-nations clauses from all proposed settlement agreements herein are hereby granted; the application of defendants Kane-Miller Corp., Bayshore Farms, Inc., Bayshore Foods, Inc., and Shorgood Poultry Distributors, Inc. for a declaratory ruling that they are entitled to a refund under the most-favored-nations clause of the Kane-Miller settlement agreement is hereby denied as moot; the joint motions of settling plaintiffs and settling defendants for certification and approval of settlement classes and for approval of the proposed forms of class notice are hereby granted subject to compliance with the court's specific rulings thereon; the plaintiffs' motion for approval

---

47. The court may choose to consider this expenditure in connection with subsequent attorney's fees determinations.

48. Although plaintiffs also seek approval of payment of "reasonable disbursements in-

curred in connection therewith (i.e., approximately $80.00)" no statement or affidavit has been filed in support thereof. Therefore, plaintiffs' request for approval of expenditures for such disbursements is denied.

and certification of the Master Mailing List is hereby granted; the application of defendants Perdue, Inc. and Perdue Farms, Inc. for approval of security is hereby granted; and the special master's request for allowance of additional fees and expenses is hereby granted.

All parties of record are hereby directed to immediately evaluate their settlement positions herein in light of the foregoing rulings and to file any and all appropriate motions relating thereto on or before May 14, 1979. Plaintiffs are hereby directed to file a proposed timetable for implementation of the class settlement notice procedures on that date. Thereafter, the court will schedule this matter for a hearing on final approval of all settlements as proposed on that date.