103 F.3d 223
 36 Fed.R.Serv.3d 1507, 52 Soc.Sec.Rep.Ser. 400,
Medicare & Medicaid Guide P 44,971
 Michele CATANZANO, by her parent and next friend, Sam
CATANZANO, Francine Catanzano, and Sarah Trafton,
on behalf of herself and all persons
similarly situated, Plaintiffs-Appellees,
Jannie Wilson, Mary Jane Smith, and Charles Smith,
Intervenors-Plaintiffs-Appellees,
Andrew Doniger, M.D., as Director of the Monroe County
Department of Health, and Richard F. Schauseil, as Acting
Director of the Monroe County Department of Social Services,
Defendants-Third-Party-Plaintiffs,
v.
Brian WING, as Acting Commissioner of the New York State
Department of Social Services, Defendant-Appellant,
Visiting Nurse Service of New York Home Care, Metropolitan
Jewish Geriatric Center, and Home Care Association
of New York State, Inc., Movants-Appellants,
Mary Jo Bane, Defendant-Third-Party-Defendant,
Mark Chassin, as Commissioner of the State of New York
Department of Health, Third-Party-Defendant,
W. Burton Richardson and Joel Nitzken, Defendants.
 Nos. 24, 427, 68, 70 and 69, Dockets 95-9037L, 95-9243,
95-9255, 95-9257 and 95-9277.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 13, 1996.
Decided Dec. 23, 1996.
 
 Peter G. Crary, Assistant Attorney General of the State of New York, Albany, NY (Dennis C. Vacco, Attorney General of the State of New York, Peter H. Schiff, Deputy Solicitor General, Patrick Barnett-Mulligan, Assistant Attorney General, of counsel), for Defendant-Appellant.
 Peter G. Bergman, Cadwalader, Wickersham & Taft, New York City (Eileen M. Considine, Hinman, Straub, Pigors & Manning, P.C., Albany, NY, of counsel), for Movants-Appellants VNS and MJGC.
 Thomas F. Gleason, Gleason, Dunn, Walsh & O'Shea, Albany, NY, for Movant-Appellant HCA.
 Ellen Yacknin, Greater Upstate Law Project, Inc., Rochester, NY (Bryan D. Hetherington, Susan Ann Silverstein, Public Interest Law Office of Rochester, Rochester, NY, of counsel), for Plaintiffs-Appellees and Intervenors-Plaintiffs-Appellees.
 Before: OAKES and CALABRESI, Circuit Judges, and CONNER,* District Judge.
 CALABRESI, Circuit Judge:
 
 
 1
 Complex regulatory schemes produce complex cases. And the interplay between complex state and federal statutory and regulatory schemes produces very complicated cases. This is just such a case. In it, we consider the scope of our prior decision, Catanzano v. Dowling, 60 F.3d 113 (2d Cir.1995), and the extent to which it already decided various issues of federal and state statutory and regulatory law brought to us in this appeal.
 
 BACKGROUND
 A. Statutory and Regulatory Framework
 
 2
 The Medicaid program is controlled by Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 et seq. Medicaid is a joint federal and state program designed to provide medical assistance to the financially needy. It is subsidized by the federal government, but administered by the states. Participation by a state in the program is voluntary, but once a state chooses to participate, it must comply with the federal Medicaid Act. See, e.g., Harris v. McRae, 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784 (1980). A participating state must submit a "state plan" to the Secretary of Health and Human Services. 42 U.S.C. § 1396. That plan must, among other things, include provisions for "home health services" to qualified recipients. 42 U.S.C. § 1396d(a)(7). Home health services, which are prescribed by the patient's physician, are provided in the recipient's home, and include anything from assisting in dressing and preparing meals to administering medication and monitoring the recipient's medical condition. 42 C.F.R. § 440.70.
 
 
 3
 Under New York law, home health services in New York must be provided by Certified Home Health Agencies ("CHHAs"). N.Y. Public Health Law §§ 3602(3), 3614(1). CHHAs employ professional nurses who make their own determinations as to the medical necessity and appropriateness of home health services. In 1991 and 1992, New York amended its laws governing home health care to create a four-step process by which a CHHA must determine whether or not home health services should be provided. N.Y. Social Services Law § 367-j; N.Y.COMP.CODES R. & REGS. tit. 18, § 505.23. Once a patient's physician has ordered home health services, and periodically thereafter, a CHHA must make a "fiscal assessment," the form of which differs depending upon the expected length of the period of care. If the period of care is expected to be less than 60 days, the CHHA makes only a two-step determination: 1) is home health care medically necessary and can it be safely provided? 2) are there less expensive ways to deliver the same amount of care? If the period of care is longer than 60 days, the CHHA must make two additional determinations: 3) will the cost of home health care exceed 90 percent of the cost of institutionalization? 4) if so, does the patient meet one of the statutory exceptions to mandatory institutionalization? When a CHHA makes a decision pursuant to steps 3 and 4, it must inform the local Department of Social Services ("DSS"). If the DSS and the CHHA disagree on the amount (if any) of care to be provided, the matter is referred to the "local professional director," whose decision is binding on the CHHA and the recipient. A recipient who is unhappy with this decision is allowed a full due-process "fair hearing" before an administrative law judge. The statute and regulation do not allow for "fair hearings" when the CHHA denies benefits pursuant to steps 1 or 2, or when the CHHA and the DSS agree to deny benefits under steps 3 and 4.
 
 B. The Instant Case
 
 4
 This case has a long history. It began in 1989 when the CHHA operated by defendant Monroe County Department of Health decided to reduce the amount of Medicaid-funded home health care services that had been prescribed by plaintiff Michele Catanzano's physician. Catanzano was thirteen years old at the time, and was recovering from spinal fusion surgery. Judge Larimer preliminarily enjoined the reduction in services because Catanzano had not been provided with notice, hearing rights, or "aid-continuing."[1] In an unpublished opinion, this court affirmed that preliminary injunction. Catanzano v. Richardson, 902 F.2d 1556 (2d Cir.1990). Shortly thereafter, Judge Larimer certified the plaintiff class, which now consists of "[a]ll New York State recipients and applicants of Medicaid-funded home health care who receive less home health care than most recently ordered by their treating physician or who have had their home health care suspended, denied, terminated, or reduced without prior notice, right to a fair hearing and aid-continuing." Catanzano v. Dowling, 847 F.Supp. 1070, 1079 (W.D.N.Y.1994).
 
 
 5
 The following year, New York amended its health care law to create the four-step decision-making process discussed above. Catanzano promptly amended her complaint to challenge the amended law. In 1994, finding that "serious violations of federal law have occurred, and continue to occur," Judge Larimer preliminarily enjoined the operation of the amended laws because, in each of the four steps, recipients' benefits could be reduced, terminated, or denied without due process "fair hearing" rights. Catanzano, 847 F.Supp. at 1074. The defendants appealed, arguing that the decisions made by the CHHAs in the first two steps of the process are decisions of private parties exercising professional judgment, and therefore are not actions of the state implicating fair hearing rights.
 
 
 6
 We rejected that argument and affirmed the decision of the district court. Catanzano v. Dowling, 60 F.3d 113 (2d Cir.1995). We noted that the Medicaid statute requires state plans to "provide for granting an opportunity for a fair hearing" whenever an applicant's requested services are denied, 42 U.S.C. § 1396a(a)(3), and that federal regulations make clear that benefits may not be denied, terminated, or reduced without granting the applicant a fair hearing that meets the due process standards promulgated in Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). See Catanzano, 60 F.3d at 115 (citing 42 C.F.R. §§ 431.200, 431.205). We further noted, however, that due process rights are only implicated when the adverse action can be attributed to the state, and therefore that the claimants are only entitled to fair hearings if the CHHA's decisions to deny benefits pursuant to steps 1 and 2 are decisions of the state. We held that they are. "CHHAs are not simply regulated by the State; rather, they are deeply integrated into the regulatory scheme set up by section 367-j...." Id. at 119. We elaborated:
 
 
 7
 [T]he decisions made by the CHHA are not purely medical judgments made according to professional standards. Instead, section 367-j(2)(a)(i) requires the CHHAs to determine whether the health and safety of the recipient can be maintained "as defined by the department of health in regulation." Furthermore, the statute provides the specific alternatives that the CHHA is to consider in making the "efficiency" determinations mandated in step two.... [Finally,] the State has delegated its responsibility for "prior approval" to CHHAs. Prior approval ... is the general term for the process by which it is determined whether requested services are medically necessary.... For benefits other than home health care, patients adversely affected by prior approval determinations are entitled to a fair hearing. The state may not circumvent this requirement by delegating prior approval to CHHAs. Accordingly, the CHHAs are not independent actors doing business with the state, but are entities that have assumed the responsibility for the State's mandated health care duties.
 
 
 8
 Id. at 119-20 (citations and internal quotation marks omitted); see also Grijalva v. Shalala, 946 F.Supp. 747, 751-53 (D.Ariz.1996) (applying the analysis in Catanzano ).
 
 
 9
 Following this court's decision, the district court ordered the parties to prepare a final plan to implement the injunction. The parties could not agree on one crucial element of that plan: whether the CHHAs have the right to refuse to provide home health services to a patient even after the administrative law judge in a fair hearing has found for the recipient and against the CHHA. Judge Larimer concluded that they do not:
 
 
 10
 While it is true that the Court of Appeals did not directly address this question, the implications of its reasoning are clear, and support plaintiffs' position.... [T]he State cannot relieve itself of the obligation to provide home health care to eligible applicants merely because a CHHA does not wish to provide care. The State's position that the "Court of Appeals holding simply means that the State is responsible for certain CHHA decisions to deny, reduce, or discontinue home care" would be made meaningless if CHHAs could refuse to provide care even when the State itself is obligated to provide care. The State's "responsibility" would provide cold comfort to the applicant if that responsibility could be evaded simply by delegating these decisions to CHHAs.
 
 
 11
 Catanzano v. Dowling, 900 F.Supp. 650, 652 (W.D.N.Y.1995) (citation omitted).
 
 
 12
 On October 24, 1995, Visiting Nurse Service of New York Home Care ("VNS"), the largest not-for-profit provider of home health services in the United States, Metropolitan Jewish Geriatric Center ("MJGC"), one of the largest such providers in New York City, and Home Care Association of New York State, Inc. ("HCA"), an association of CHHAs, filed motions for intervention as of right or alternatively by permission. By decision and order dated December 5, 1995, Judge Larimer refused to reconsider his September 20, 1995 order and denied the proposed intervenors' motions for intervention. The court did, however, allow VNS and MJGC to appear as amici curiae.[2] Defendant Wing and the proposed intervenors all appeal from the December 5, 1995 order and from the underlying order of September 20, 1995.
 
 DISCUSSION
 A. Forced Care
 
 13
 "We review the scope of a district court's injunction for abuse of discretion," Ragin v. Harry Macklowe Real Estate Co., 6 F.3d 898, 909 (2d Cir.1993), which "can be found if the district court relied upon a clearly erroneous finding of fact or incorrectly applied the law." Nikon Inc. v. Ikon Corp., 987 F.2d 91, 94 (2d Cir.1993). In this case, the question is whether the district court erred by misapplying the controlling statutory, regulatory, and case law.
 
 
 14
 The defendant and the proposed intervenors (collectively "the CHHAs") argue that, even though they must provide a due process hearing before denying, reducing, or terminating home health care benefits, they cannot be forced to provide care if the claimant prevails in that hearing. The CHHAs base this argument on three theories, two of which we reject on the ground that they are foreclosed by our prior decision. As to the third theory, however, we find that the district court erred in concluding that it too was foreclosed by our prior decision, and we therefore vacate that portion of the district court's order and remand with instructions to consider the third theory anew.
 
 
 15
 * The CHHAs' first theory of why they are not bound to provide care to claimants who prevail in their administrative hearings relies on a limited conception of the extent to which they are to be considered state actors. The CHHAs do not deny that the Medicaid fair hearing regulations contemplate that the results of such hearings will be binding on the state. See, e.g., 42 C.F.R. § 431.246 (the agency must provide retroactive benefits and provide for admission to the medical facility if the hearing decision is favorable to the applicant). Instead, the CHHAs argue that this fact is irrelevant to them because they are only state actors in making the eligibility determination, not in shouldering the state's burden to abide by the administrative hearing decision.
 
 
 16
 According to the CHHAs, this court's prior decision established only that CHHAs are state actors when they make determinations as to eligibility pursuant to state regulations. Since the question of whether a person is a state actor will depend "on the nature and context of the function he is performing," Georgia v. McCollum, 505 U.S. 42, 54, 112 S.Ct. 2348, 2356, 120 L.Ed.2d 33 (1992), the fact that a person is a state actor for one purpose does not mean that she is a state actor for all purposes. See, e.g., Air Line Pilots Ass'n Int'l v. Department of Aviation of Chicago, 45 F.3d 1144, 1150 (7th Cir.1995). Therefore, the CHHAs contend that "the fact that this Court held the CHHAs to be state actors for a limited purpose did not transform the CHHAs into the State Medicaid agency for all purposes," such as having to comply with the decision of the administrative hearing.
 
 
 17
 This argument is without merit. The fact that we have concluded that CHHAs are state actors in making the eligibility determination necessarily compels the conclusion that CHHAs are also state actors in being bound by the results of administrative hearings overturning their determinations. The CHHA is "the state" at the fair hearing, and must therefore be required to shoulder "the state's" burden if it loses at that hearing.
 
 
 18
 The CHHAs attempt to bolster this theory by arguing that a CHHA's decision as to whether to provide home health services to a patient is really a two-part decision: 1) is this patient entitled to home health services under the Medicaid statute and regulations? 2) if so, do we believe, in the exercise of our independent medical judgment, that those services should be provided to this patient? This court's prior decision clearly established that, in answering the first question, a CHHA acts as the state. According to the CHHAs, however, a determination under the second question is an "independent professional medical judgment" of a private actor. The CHHAs argue that "while some CHHA decisions as to reimbursement assessments might rise to the level of State action, giving rise to fair hearing rights, it is clear that professional decisions not to provide care do not, because they are not implemented by the 'coercive power' of the State." As such, requiring a CHHA to comply against its will with an ALJ's decision would conflate these two distinct decisions and would wrongly attribute state action to what is essentially a private decision about "the medical condition of the patient, or other legitimate problems that make care dangerous or inappropriate."
 
 
 19
 We reject this argument as well. We have already explained that the CHHA makes both the "eligibility" decision and the "professional medical judgment" decision in the same step: indeed, they are the same decision.[3] To say, as the CHHAs want us to, that the "eligibility" decision is that of the state, but the "medical judgment" decision is that of a private actor is in essence to say that, although the decision is in part state action requiring due process rights, it is also in part private action such that the mandated due process rights cannot in fact affect the final decision. This flouts our conclusion that "the decisions made by the CHHA are not purely medical judgments made according to professional standards"; rather, "the CHHAs' determinations in steps one and two must in law be deemed those of the State." Catanzano, 60 F.3d at 119, 120 (internal quotation marks omitted).
 
 
 20
 We have already held that the CHHAs' determinations as to medical necessity and safety are those of the state and not private medical judgments. We further note that if the CHHAs' "medical" judgments were not reversible as a result of the administrative hearings that we have mandated, then there would be no point whatsoever in requiring those hearings. Accordingly, we decline to adopt what is in effect no more than an attempt to make an end run around our prior decision, and around the fundamental notion that, "[i]n compliance with the principle of ubi jus ibi remedium ('where there is a right there is a remedy'), the statutory right to a fair hearing must include within it the right to effective redress." Greenstein v. Bane, 833 F.Supp. 1054, 1077 (S.D.N.Y.1993).
 
 II
 
 21
 The CHHAs' second theory of why they cannot be forced to comply with the administrative hearing decisions is more sophisticated. The district court's opinion assumes that the state has a duty to provide care to eligible Medicaid applicants: "[T]he State cannot relieve itself of the obligation to provide home health care to eligible applicants merely because a CHHA does not wish to provide care." Catanzano, 900 F.Supp. at 652. The plaintiffs too rely on this assumption. They argue that "unless CHHAs are required to comply with final administrative decisions, the State's obligation to provide home health services ... could be evaded simply by delegating these decisions to the CHHAs." The CHHAs assert that the fundamental error in this analysis is that, under the Medicaid system, the state does not have an obligation to provide care; its obligation is only to provide funding to reimburse the expenses of health care providers.
 
 
 22
 In general, that is true. A state's Medicaid plan must make "medical assistance" available to qualified recipients. 42 U.S.C. § 1396a(a)(10). "The term 'medical assistance' means payment of part or all of the cost of ... care and services." 42 U.S.C. § 1396d(a). The state has no affirmative duty to provide the care itself. See, e.g., K. Edward Greene, Mental Health Care for Children: Before and During State Custody, 13 CAMPBELL L.REV. 1, 54 (1990) ("A state has a statutory obligation to provide medical assistance (Medicaid).... However, the state's obligation is not to actually provide care, but to pay for the cost of care when the claimant presents herself for treatment."); Blum v. Yaretsky, 457 U.S. 991, 1011, 102 S.Ct. 2777, 2789, 73 L.Ed.2d 534 (1982) ("[T]he Medicaid statute requires that the States provide funding for skilled nursing services as a condition to the receipt of federal monies. It does not require that the States provide the services themselves.") (citation omitted).
 
 
 23
 That being so, defendant Wing and the proposed intervenors contend that while this court has held that the CHHAs "have assumed the responsibility for the State's mandated health care duties," Catanzano, 60 F.3d at 120 (citation and internal quotation marks omitted), those duties are not to provide care, but only to provide a fair hearing and to order the reimbursement of any provider who is willing to provide care. In other words, the ALJ's decisions are binding on the state (and the CHHA), but those decisions can only require the state to make funds available; they cannot require the state (and thus the CHHA) to provide care. It would follow that a CHHA cannot be forced to provide home health services by the fair hearing decision.
 
 
 24
 This argument, while not without force, must nonetheless fail. Our prior decision in this case necessarily rejected it. As Judge Larimer noted: "the implications of [the Court of Appeals'] reasoning are clear, and support plaintiffs' position." Catanzano, 900 F.Supp. at 652.
 
 
 25
 Under New York law, there is no point in holding that the fair hearing does no more than bind the government to reimburse any future CHHA that would be willing to care for the patient. For under that law, any CHHA that might come along in the future and decide that it is willing to provide care under steps 1 and 2 would not need government approval of its decision in order to be reimbursed. See Catanzano, 60 F.3d at 117-18 (decisions under steps 1 and 2 are final and "are not forwarded to a local DSS for ratification or approval"). To put it another way, since the state has delegated to the CHHAs the authority to determine whether or not the state is obligated to reimburse them for the costs of providing care, see N.Y. Social Services Law § 367-j(2), the government is always bound to reimburse any willing CHHA that decides pursuant to the first two steps of the decision making process to provide care--regardless of whether there has been a fair hearing in the past. The CHHAs' approach would thus, once again, render the due process hearing (and our prior opinion mandating it) meaningless.[4]
 
 
 26
 If the CHHAs are not bound to provide care by the results of the fair hearing and if our holding did no more than establish the right to a due process hearing through which patients could establish a governmental duty to reimburse in a situation where, by definition, there is no one willing to be reimbursed, and where, if there were someone willing to be reimbursed, the government would be bound to reimburse them regardless of the hearing, then our prior opinion established absolutely nothing. It is a "well-established principle that the doctrine of the law of the case applies to issues that have been decided either expressly or by necessary implication." DeWeerth v. Baldinger, 38 F.3d 1266, 1271 (2d Cir.) (citation and internal quotation marks omitted), cert. denied, 513 U.S. 1001, 115 S.Ct. 512, 130 L.Ed.2d 419 (1994). Since our opinion would make no sense if it did not contemplate that an unsuccessful CHHA would be obligated under New York law to provide the victorious applicant with care, it must be the case that the obligation of the CHHAs to provide care has already been determined.
 
 
 27
 In other words, we have held in our prior decision that New York, by setting up the unique structure that governs the provision of home health services in the state, has implicitly but inexorably obligated itself to see to it that home health services are made available to qualified claimants. And since under New York law home health services can only be provided by CHHAs, N.Y. Public Health Law §§ 3602(3), 3614(1), it follows, equally inexorably, that New York has obligated the CHHAs to provide those services.[5]
 
 
 28
 Moreover, a close examination of N.Y. Social Services Law § 367-j reveals that the statute itself contemplates the result that the defendant and the proposed intervenors claim cannot come about. There are, under the statute, express situations in which the state forces a CHHA to provide aid-continuing and care when it would prefer not to. When a CHHA makes a determination as to eligibility under steps 3 and 4 of the process, it must inform a local social services official. When that official disagrees with the CHHA (such as when the CHHA does not believe that home health care is warranted, but the local official does), the matter is referred to a local professional director. "The local professional director ... must review the [CHHA's] fiscal assessment and case documentation ... and is responsible for the final determination of ... whether the certified home health agency must continue to provide home health services to the recipient...." N.Y. Social Services Law § 367-j(1)(i)(iv) (emphasis added); see also N.Y.COMP.CODES R. & REGS. tit. 18, § 505.23(c)(12)(ii)(c) (the local professional director will determine "whether the [CHHA] must provide, or continue to provide, home health services to the recipient") (emphasis added). As such, the CHHAs' argument that they simply cannot be forced to provide home health benefits against their will is conclusively undermined. This statutory language makes manifest that, at least in some instances, New York law contemplates that a CHHA can be forced by the decision of an independent government agent to provide services.
 
 
 29
 Since New York has obligated itself (and thus the CHHAs) to provide home health services to qualified claimants, the CHHAs' claim that the district court erred in assuming that the state has a duty to provide care must be rejected.
 
 III
 
 30
 The CHHAs' third theory of why they cannot be forced to offer home health services against their will is that, even if New York has ostensibly obligated them to do so, federal law forbids this result. Because a state that chooses to participate in the Medicaid program may not implement a Medicaid plan that violates federal law, see, e.g., Caldwell v. Blum, 621 F.2d 491, 494 (2d Cir.1980), it follows that if federal law precludes a state from forcing its providers to give home health care, then this portion of the district court's injunction cannot stand.
 
 
 31
 In claiming that federal law does prohibit a state from so obligating its providers, the CHHAs rely on Medicaid's "freedom of choice" (or "willing provider") law. Under 42 U.S.C. § 1396a(a)(23), a Medicaid claimant may obtain services from any qualified provider "who undertakes to provide him such services." The federal regulations elaborate that "a recipient may obtain Medicaid services from any [provider] that is ... [w]illing to furnish them to that particular recipient." 42 C.F.R. § 431.51(b)(1)(i). The Health Care Financing Administration noted in its explanation of the 1991 amendments to this regulation that it "added language to counteract a misunderstanding that has arisen in the past: freedom of choice does not obligate a Medicaid provider to furnish services to every recipient.... [A] recipient may seek to obtain services from any qualified provider, but the provider determines whether to furnish services to that particular recipient." 56 Fed.Reg. 8835 (1991). The defendant argues that "[u]nder the plain meaning of these provisions, a service provider such as a CHHA cannot be compelled to provide care to a particular recipient."
 
 
 32
 The applicability (or inapplicability) of these provisions to the case at bar is hardly plain. It is true that the Health Care Financing Administration noted that "freedom of choice does not obligate a Medicaid provider to furnish services to every recipient." But the question in this case is not whether the freedom of choice law itself obligates the provider. It clearly does not. Rather, it is whether, in a situation in which the state has obligated the provider, the freedom of choice law renders that obligation invalid.
 
 
 33
 That question depends on whether, in addition to placing a limit on the federal rights of the claimant, the freedom of choice law also creates affirmative federal rights in the provider. On that point, the law is not entirely clear. Compare RX Pharmacies Plus, Inc. v. Weil, 883 F.Supp. 549, 553-54 (D.Colo.1995) (surveying cases and legislative history and concluding "that the freedom of choice provisions, 42 U.S.C. § 1396a(a)(23), were intended to protect Medicaid recipients, and do not confer any enforceable rights on Medicaid providers"), and O'Bannon v. Town Court Nursing Center, 447 U.S. 773, 785, 100 S.Ct. 2467, 2475, 65 L.Ed.2d 506 (1980) (the freedom of choice law "gives recipients the right to choose among a range of qualified providers, without government interference") (emphasis altered), with Linton v. Commissioner, 973 F.2d 1311, 1316-17 (6th Cir.1992) (concluding that providers satisfied standing requirements in part by alleging that a state plan that locked them into providing care against their will in certain circumstances was in conflict with the federal freedom of choice law). Upon review of the case law, we are inclined to agree with the Eleventh Circuit that "[t]here is no [clear] precedent in this circuit or in any other circuit on" the question of "whether this provision of the Social Security Act [42 U.S.C. § 1396a(a)(23) ] creates a right enforceable by" Medicaid providers. Silver v. Baggiano, 804 F.2d 1211, 1217 (11th Cir.1986).
 
 
 34
 Our prior opinion did not discuss this issue. And we did not decide the question by implication. Our decision was concerned with whether, by delegating the benefit entitlement decision to the CHHAs in the face of federal due process requirements, New York State obligated the CHHAs to provide both due process hearings to adversely affected claimants and home health services to those claimants who succeeded in their hearings. We did not consider whether or not federal law forbade the latter obligation. Nor did the district court address the "willing provider" issue in any detail, apparently concluding that our prior opinion had already decided it. See Catanzano, 900 F.Supp. at 652. Because we do not have the benefit of the district court's consideration of this difficult issue, and because we do not have adequate briefing on the question before us at this time, we remand the issue to the district court for plenary consideration. Cf. Silver, 804 F.2d at 1217-18 (remanding because court of appeals was "without [the district] court's consideration of the question" of whether 42 U.S.C. § 1396a(a)(23) creates rights in Medicaid providers).
 
 B. Intervention
 
 35
 We review a district court's order denying intervention (as of right under Fed.R.Civ.P. 24(a) or by permission under Fed.R.Civ.P. 24(b)) for abuse of discretion. See, e.g., New York News, Inc. v. Kheel, 972 F.2d 482, 485 (2d Cir.1992). No such abuse was present here.
 
 
 36
 "In order to intervene as of right under Fed.R.Civ.P. 24(a)(2), an applicant must (1) timely file an application, (2) show an interest in the action, (3) demonstrate that the interest may be impaired by the disposition of the action, and (4) show that the interest is not protected adequately by the parties to the action." Id. "Failure to satisfy any one of these requirements is a sufficient ground to deny the application." Farmland Dairies v. Commissioner, 847 F.2d 1038, 1043 (2d Cir.1988). The district court concluded that the proposed intervenors failed to meet the first and fourth requirements. We find that the court did not abuse its discretion with regard to the first requirement, and we therefore do not need to review the court's decision concerning the fourth requirement.
 
 
 37
 Among the most important factors in a timeliness decision is "the length of time the applicant knew or should have known of his interest before making the motion." Id. at 1044. The proposed intervenors were well aware long before they filed their motions for intervention that they stood to be forced to provide aid-continuing against their will and judgment. In early 1994, all CHHA administrators (including the proposed intervenors) were notified by letter of the aid-continuing provisions of the district court's preliminary injunction. In addition, the district court's published opinion of March 31, 1994, made clear that CHHAs must provide aid-continuing before terminating benefits. See Catanzano, 847 F.Supp. at 1086. The intervention motions at issue on this appeal were not filed until October 24, 1995--at least eighteen months after the proposed intervenors should have known that they could be required to provide aid-continuing against their will by this litigation.
 
 
 38
 Faced with these facts, the CHHAs argue that
 
 
 39
 [p]laintiffs' entitlement to aid-continuing, although an important issue to all CHHAs, is not the interest that prompted VNS and MJGC to move to intervene in this lawsuit. The issue articulated by VNS and MJGC on their intervention motion is whether an individual CHHA can be forced to provide care against its professional judgment.
 
 
 40
 The CHHAs claim that they had "no suspicion" that such a result would stem from this lawsuit until the district court's most recent order, and that that order came as a "total surprise" to them.
 
 
 41
 It is true that the district court stated in June 1995 that "this issue concerning the CHHA's right to refuse to provide services to a particular patient was not before the Court or fully addressed as part of the preliminary injunction motion." But even if the issue itself had not been argued, it was clearly present in the litigation from the very beginning. Aid-continuing rights necessarily involve the provision of care against the will or judgment of the entitlement decision-maker: precisely the issue as to which the CHHAs seek to intervene. Moreover, to the extent that the CHHAs are arguing that they did not realize that individual CHHAs would be required to provide aid-continuing (instead of the government being required to reimburse any CHHAs that willingly chose to provide aid-continuing), this claim is belied by the record. The district court's first published opinion explicitly stated that CHHAs would be required to provide aid-continuing. See Catanzano, 847 F.Supp. at 1086 (ordering that the defendants must "ensure that ... CHHAs do not suspend, terminate or reduce the amount of home health care services received by members of plaintiffs' class without first providing for notice, the right to a fair hearing and aid-continuing") (emphasis omitted). Similarly, the letter sent by the state DSS to all CHHA administrators in February 1994 explicitly directed CHHAs to "continue to provide the recipient[s] with aid-continuing."
 
 
 42
 More important, quite apart from the aid-continuing issue, it has been contemplated from very early on in this litigation that the CHHAs might be forced to care for the claimants who prevailed in their administrative hearings. Indeed, why would the plaintiffs have brought suit demanding due process hearings if they did not expect the results of those hearings to be binding on the CHHAs whose decisions were to be reviewed? Not surprisingly, the record is replete with indications that the parties and the proposed intervenors understood that the CHHAs would be forced to comply with the results of the administrative hearings. For instance, in April 1994, an attorney for the state defendant affirmed that, under the court's order, the DSS would "have to work with the Department of Health to develop new procedures to assure not only that CHHAs understand their responsibilities under the fair hearing decisions but also that CHHAs promptly comply with the decisions." In addition, in May 1994, the plaintiffs submitted proposed notice forms (to be issued to claimants whose home health care benefits were denied, reduced, discontinued, or suspended) which provided: "If you think this decision is wrong you can appeal [by requesting a fair hearing]. We'll correct our mistakes." Finally, a December 1994 letter penned by one of the proposed intervenors makes perfectly clear that it understood precisely what was at stake in this case:
 
 
 43
 We would respectfully urge to your Honor that Plaintiffs have demonstrated no authority for the proposition that the Department may order a CHHA to provide care to a particular patient, notwithstanding legitimate CHHA concerns regarding the health and safety of the patient, the ability to provide the care required, or other significant reasons.
 
 
 44
 Having reviewed all of the evidence indicating that the proposed intervenors knew or should have known many months (probably years) before they filed their intervention motions that this litigation could require them to comply with the results of the requested administrative hearings, and having considered the entirety of the circumstances of the case and each of the relevant factors, including the prejudice to the parties and to the proposed intervenors, see Farmland Dairies, 847 F.2d at 1044, we cannot say that Judge Larimer abused his discretion in denying intervention as of right on the ground that the intervention motions were untimely. See, e.g., United States v. Yonkers Bd. of Educ., 801 F.2d 593, 594-95 (2d Cir.1986) ("The timeliness requirement is flexible and the decision is one entrusted to the district judge's sound discretion.").
 
 
 45
 In the alternative, the proposed intervenors ask us to reverse the district court's denial of permissive intervention under Rule 24(b)(2). "The district court has broad discretion to deny an applicant's motion for intervention under Rule 24(b)(2). In fact, a denial of permissive intervention has virtually never been reversed." Kheel, 972 F.2d at 487 (citations and internal quotation marks omitted). We will not do so here. A motion for permissive intervention, like one for intervention of right, must be timely. See Fed.R.Civ.P. 24(b). Since we have already determined that the district court did not abuse its discretion in concluding that the proposed intervenors did not file timely motions, we need not consider this issue further.
 
 
 46
 Although we have concluded that Judge Larimer did not abuse his discretion in refusing to grant intervention, we note that one aspect of the "willing provider" issue--the question of whether federal law prohibits New York State from obligating the CHHAs to provide care against their will--has only recently become central to this case.[6] Because that question is of great importance to the proposed intervenors, and because their input will no doubt be very helpful to the district court, we are confident that the court on remand will continue to allow the proposed intervenors to file briefs as amici curiae, and will give due consideration to the arguments raised in those briefs.
 
 CONCLUSION
 
 47
 We affirm the judgment of the district court, except to the extent that it assumed that our prior opinion in this case had decided the question of whether federal law precludes a state from obligating its home health care providers to give care in certain circumstances against their will. We vacate that portion of the district court's judgment that so held and remand for consideration of that question anew. While we affirm the district court's denial of intervention, we urge the court to continue to allow the proposed intervenors to have a voice in this action at least as amici curiae.
 
 
 
 *
 The Honorable William C. Conner, Senior District Judge of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 "Aid-continuing" refers to the due process right to continue to receive benefits during the period in which the recipient's right to the benefits themselves is being determined. See, e.g., Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970)
 
 
 [2]
 HCA was already involved in the action as amicus curiae
 
 
 [3]
 Under "step 1" of the state-mandated entitlement decision making process, the CHHA must decide "whether and how much home health care is medically necessary and whether that care, if any, can be provided safely in the home." Catanzano, 60 F.3d at 115
 
 
 [4]
 Indeed, were there a CHHA that was willing to provide care, the whole process mandated by our prior opinion would be unnecessary. That process is only needed in the absence of a willing CHHA
 
 
 [5]
 Under the law of the case doctrine, "we will only reconsider a prior decision in the same case if there has been an intervening change in controlling law, there is new evidence, or a need is shown to correct a clear error of law or to prevent manifest injustice." United States v. Sanchez, 35 F.3d 673, 677 (2d Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 1404, 131 L.Ed.2d 291 (1995). None of these circumstances is present here
 
 
 [6]
 While this aspect of the "willing provider" theory is new to the case, the interest of the proposed intervenors that it implicates--their desire not to be forced to provide home health services against their will--is the same interest that is implicated by the CHHAs' other theories in this case. As such, the fact that the district court failed to recognize that our prior opinion did not address this issue does not affect our conclusion that the district court did not abuse its discretion in holding the motions for intervention to be untimely