### In re HOLOCAUST VICTIM ASSETS LITIGATION,

**Gizella Weisshaus, on behalf of herself and all persons similarly situated, Plaintiffs–Appellees,**

**Polish American Defense Committee, Inc. et al., on behalf of themselves and all persons similarly situated, Appellants,**

v.

**Swiss Bankers Association et al., Defendants.**

**Docket No. 00–7045.**

United States Court of Appeals, Second Circuit.

Argued: Aug. 9, 2000

Decided: Sept. 21, 2000

Constantine P. Kokkoris, New York, NY, for Appellants.

Burt Neuborne, New York, NY, for Plaintiffs–Appellees.

Richard H. Kosinski, New Britain, CT, for Amicus Curiae Federation of Polish Americans, Inc.

Before: CABRANES and POOLER, Circuit Judges.[*]

JOSÉ A. CABRANES, Circuit Judge:

The Polish American Defense Committee ("PADC") and six named individuals appeal from a December 7, 1999 order of the United States District Court for the Eastern District of New York (Edward R. Korman, *Judge*) that denied their motion to intervene in a consolidated class action lawsuit seeking redress for wrongs arising out of defendants' "knowing participation and complicity in crimes against humanity, crimes against peace, and war crimes" committed against plaintiffs by the Nazi regime.[1] The proposed intervenors object to the certification of a narrower settlement class than the one described in the original complaints. They wish to intervene in the lawsuit in order to redefine the settlement class to include persons, other than those who were or were believed to be "Jewish, Romani, Jehovah's Witness, homosexual, or physically or mentally disabled or handicapped," who were targeted for persecution by the Nazis on the basis of Polish nationality (in the words of appel-

lants' brief, "ethnic Poles") and their heirs. We affirm the order of the District Court.

## I.

*In re Holocaust Victim Assets Litigation* is the overarching caption for four consolidated class action lawsuits filed on behalf of various worldwide classes of victims of Nazi crimes and their heirs against a group of Swiss banks. These lawsuits seek redress for the defendants' "knowing participation and complicity in crimes" committed against plaintiffs and their relatives by the Nazi regime. Plaintiffs allege that the Swiss banks unjustly enriched themselves at the expense of these victims by: (1) failing to account for funds deposited in the years preceding the period of Nazi persecution by individuals who feared they would become the targets of this persecution and who then failed to survive the death camps; (2) serving as a vehicle for the disposal of Nazi plunder looted from victims; and (3) financing the construction of Nazi slave labor camps and providing a safe haven for profits obtained through the use of slave labor.

In April 1997, the District Court established an Executive Committee of plaintiffs' counsel, which in turn established an informal ad hoc committee, consisting of leaders of interested Jewish organizations, to provide advice on the litigation to plaintiffs. Plaintiffs' counsel requested that Rabbi Israel Singer of the World Jewish Restitution Organization ("WJRO") serve on the parties' Negotiation Committee

---

[*] Judge Guido Calabresi, originally a member of the panel sitting on August 9, 2000, recused himself during oral argument and did not participate in the disposition of this appeal. The remaining members of the panel, who are in agreement, have decided the case, pursuant to 2D CIR. R. § 0.14(b).

1. Pursuant to our request at oral argument, counsel for appellants submitted a letter clarifying the identities of the proposed intervenors and the difference, if any, between these and the appellants. His letter identifies the appellants as PADC and six named individuals: Danuta Zawadzki, Andrew T. Zamoyski, Inka Zamoyski, Mika Zamoyski, Annette Zamoyski, and Jerzy Pujdak. It also explains

that the Polish American Congress was a party to the motion to intervene but did not join in this appeal. Because the original caption on appeal mistakenly identified the Polish American Congress as the appellant, we have modified it accordingly.

Also pursuant to our request at oral argument, counsel for appellees submitted a response to the letter from appellants' counsel. In it, he reiterates appellees' challenge to PADC's standing and, in addition, raises a challenge to the standing of the individual appellants. We then requested and received a reply from appellants concerning the standing of individual appellants. We discuss standing below, in Part II.

once settlement discussions commenced, and the WJRO intervened as a plaintiff on consent of the parties. Plaintiffs' counsel also obtained the advice of the government of Israel and officials of the United States Department of State, and monitored the work of the International Committee of Eminent Persons ("ICEP"), a joint project of the WJRO and the Swiss banking community conducting an audit of Swiss banks under the chairmanship of Paul A. Volcker, a former head of the Federal Reserve System, to determine the extent of accounts owned by victims of the Nazis.

During 1997–1998, extensive settlement negotiations began, stalled, and resumed. As part of this process, plaintiffs prepared an economic analysis estimating the percentage of assets belonging to European Jews that were transferred into Swiss banks during the relevant period. Shortly after plaintiffs' presentation of this analysis to the District Court, the parties agreed to a settlement amount of $1.25 billion. An "Agreement in Principle" dictated into the record on August 12, 1998 stated that the parties had reached a settlement "on behalf of the worldwide classes delineated in the complaints" that would provide "complete and total releases" for defendants for claims arising out of the era of Nazi persecution and its aftermath.

By January 26, 1999, the parties had reduced the proposed settlement agreement (the "Settlement") to writing. It defines "Victims or Targets of Nazi Persecution" as those persons "persecuted or targeted for persecution by the Nazi Regime because they were or were believed to be Jewish, Romani, Jehovah's Witness, homosexual, or physically or mentally disabled or handicapped." This definition reflects the parties' agreement that the Settlement should benefit persons targeted for persecution "on grounds of race, reli-

gion, or personal status." The Settlement divides the plaintiff class into five subclasses, four of which are limited to "Victims or Targets of Nazi Persecution." A fifth subclass, "Slave Labor Class II," covers any individual, including ethnic Poles, who performed slave labor for an entity "headquartered, organized, or based in Switzerland."

On February 28, 1999, PADC chairman Teodor Polak submitted a letter to the District Court objecting to the exclusion of ethnic Poles from the definition of "Victims or Targets of Nazi Persecution." Of this definition, Dr. Polak wrote: "After Jewish, it should say, 'Polish.'" Dr. Polak's letter supplied a brief account of persecution of ethnic Poles by the Nazis and requested information on how to proceed in order to ensure that these victims were not omitted from the Settlement.

On March 30, 1999, the District Court provisionally certified the class proposed by the parties and preliminarily approved the Settlement. During the summer of 1999, plaintiffs implemented a worldwide notice program describing the Settlement and the classes, and providing potential class members with an opportunity to opt out, pursuant to Rule 23(c)(2) of the Federal Rules of Civil Procedure.[2] The Court set October 22, 1999 as the last day to file formal objections to the Settlement.

On that final day, PADC, the Polish American Congress, and six named individuals filed a motion to intervene in the lawsuit, along with formal objections to the Settlement classes. They asserted that "ethnic Poles were among the classes of plaintiffs on whose behalf the consolidated cases were filed" but that this group had "been excluded from the definition of the class for purposes of the proposed Settlement of the cases." After a hearing on November 22, 1999, the District Court de-

---

**2.** Rule 23(c)(2) provides: "In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice shall advise each member that (A) the court will exclude the member from the class if the member so requests by a specified date...."

nied their motion in a one-sentence written order entered on December 7, 1999.

This appeal, by PADC and the six individuals, followed.

## II.

We begin by addressing the question of standing. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (prohibiting the exercise of "hypothetical jurisdiction" over parties without standing). Appellees challenge both PADC's and individual appellants' standing to intervene in this lawsuit. PADC argues that it has organizational standing to challenge the Settlement on behalf of excluded ethnic Poles as a non-profit organization "whose purpose it is to represent the interests of ethnic Poles and their heirs."[3] In its briefs, PADC does not explicitly address the standing of individual appellants, but the documents in support of the motion to intervene include a sample complaint describing the parties, including individual appellants, and their allegations against the Swiss banks.[4]

We have recently observed that, "[a]t an irreducible constitutional minimum, Article III standing requires (1) that the plaintiff have suffered an injury in fact ...; (2) that there be a causal connection between the injury and the conduct complained of ...; and (3) that it be likely that the injury complained of would be redressed by a favorable decision." *St. Pierre v. Dyer*, 208 F.3d 394, 401 (2d Cir.2000) (internal quotation marks omitted). The "triad of injury in fact, causation, and redressability comprises the core of Article III's case-or-controversy requirement." *Steel Co.*, 523 U.S. at 103–04, 118 S.Ct. 1003 (citations omitted).

■ We look to appellants' sample complaint, submitted in support of their motion to intervene, as the source for our inquiry concerning the standing of individual appellants. *See Schulz v. Williams*, 44 F.3d 48, 53 n. 4 (2d Cir.1994) (noting that where a challenge to standing comes late in litigation, resulting in absence of documents specifically aimed at establishing elements of standing, court may look to all materials in the record). The sample complaint specifically alleges that the Nazis stole or forcibly took the assets of appel-

---

**3.** PADC also argues that it has standing to represent absent class members—namely, those who are included in Slave Labor Class II but seek to object to their exclusion from the other four subclasses. However, we do not have jurisdiction to review the objections of *absent* class members to the terms of the Settlement (as opposed to the objection of *non*-class members to their exclusion from the Settlement altogether) because this appeal was filed before the Settlement had even been approved. The District Court's order provisionally certifying the class and preliminarily approving the Settlement was a non-final order and, therefore, not appealable. Accordingly, our review is limited to the District Court's denial of appellants' motion to intervene.

On July 26, 2000, about six months after this appeal was filed, Judge Korman filed a memorandum and order giving final approval to the Settlement. By stipulation of the parties during oral argument, which we approved, that memorandum and order has been made part of the record in this case. In addition, lead class counsel forwarded to us a copy of the "Berlin Agreement," signed on July 17, 2000, establishing a German Foundation for Rememberance, Responsibility and the Future designed to compensate victims of Nazi atrocities. A letter accompanying that agreement explains that it provides for the payment of approximately $1 billion to Polish forced laborers, and "provides for full participation by Polish claimants in the property and insurance components of the Foundation." The copy of the Berlin Agreement has likewise been incorporated into the record by stipulation of the parties which we approved.

**4.** Appellees did not raise their challenge to the standing of individual appellants until after oral argument, in a letter we requested in response to appellants' letter clarifying the identities of the parties. *See supra* at n. 1. We had not asked the parties to address the standing of individual appellants, but on receiving appellees' letter, we gave appellants an opportunity to respond specifically to the arguments raised by appellees concerning individual appellants' standing. *See* Order, August 25, 2000. We have carefully considered the arguments of all parties.

lants and/or their ancestors, and/or profited from their coerced labor [5] and/or that of their ancestors, and deposited the proceeds of these illegal actions in Swiss banks. Appellants therefore allege the same injuries as existing plaintiffs, assert the same causal connection to defendants, and seek the same redress. In our view, appellants have alleged "specific, concrete facts demonstrating that the challenged [actions] harm[ed them], and that [they] personally would benefit in a tangible way from the court's intervention." *Warth v. Seldin,* 422 U.S. 490, 508, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). These allegations are sufficient to establish individual appellants' standing.

■ With respect to PADC's standing, we look for instruction to the Supreme Court, which has held that an organization has standing to bring suit on behalf of its members if: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). Unfortunately, PADC has not provided any information that would indicate whether it meets these requirements.

Other than PADC's self-proclaimed status as a representative of the Polish community, the record reveals nothing about its size, membership, or activities. We do not even know whether PADC has any members other than the individual intervenors.[6] Although in some unusual cases even an organization without "members" in a traditional sense may be deemed a membership organization for purposes of standing, *see id.* at 344–45, 97 S.Ct. 2434, the record in this case does not reveal whether PADC would qualify as such an organization. In *Hunt,* the Supreme Court held that the Washington State Apple Advertising Commission had standing to sue, despite the fact that it was a state agency, and that apple growers and dealers did not choose to be members but rather had to pay the Commission mandatory assessments, because "[i]n a very real sense ... the Commission represents the State's growers and dealers and provides the means by which they express their collective views and protect their collective interests." *Id.* at 345, 97 S.Ct. 2434. In evaluating the Commission's claim of standing, the *Hunt* Court listed a number of ways in which the Commission functioned effectively as a membership organization. *See id.* at 344–45, 97 S.Ct. 2434 (apple growers and dealers possess "indicia of membership in an organization" such as electing the Commission, serving on it, and financing its activities.). The same may be true of the relationship between the Polish American community and PADC, but on the record before us, it is impossible to know.

Accordingly, we dismiss this appeal as to PADC and proceed to consider the merits

---

5. Appellants' sample complaint refers both to "forced labor" and to "slave labor." In their letter concerning the identities of the parties, appellees briefly explain that historians "divide labor coerced by the Nazis into two categories: slave labor, imposed on those victim groups marked for extermination, and forced labor, imposed on large numbers of conquered peoples." Appellees further assert that this lawsuit aims to provide relief to persons subjected to *slave* labor. We do not think it necessary to delve into this distinction in order to determine whether appellants have made sufficient allegations to establish that they have standing.

6. Counsel for appellants informed us for the first time at oral argument that the individual intervenors are members of PADC.

only as to the named individual appellants.[7]

## III.

■ Appellants seek to intervene either as of right pursuant to Federal Rule of Civil Procedure 24(a)(2)[8] or by permission pursuant to Rule 24(b)(2).[9] We review a District Court's denial of a motion to intervene, whether as of right or by permission, for abuse of discretion. *See, e.g., New York News, Inc. v. Kheel,* 972 F.2d 482, 485 (2d Cir.1992).

We note at the outset that the Settlement does not exclude *all* Polish victims of the Nazi regime from the class. Rather, it excludes, from four out of five subclasses, those persons who were not targeted "because they were or were believed to be Jewish, Romani, Jehovah's Witness, homosexual, or physically or mentally disabled or handicapped." In other words, Polish Jews (and Polish homosexuals, and disabled Polish persons, and so on) are among those included in all five subclasses.

Nevertheless, appellants argue that the exclusion of ethnic Poles from the definition of "Victims or Targets of Nazi Persecution" is irrational and confusing,[10] and that it suggests inadequate representation of ethnic Poles by class plaintiffs, as well as a conflict of interest on the part of class counsel. Moreover, appellants contend that a denial of their motion to intervene will promote the "historically incorrect view" that ethnic Poles did not suffer at the hands of the Nazis.

### A.

■ In order to intervene as of right pursuant to Rule 24(a)(2), the applicant must: (1) file a timely motion; (2) show an interest in the litigation; (3) show that its interest may be impaired by the disposition of the action; and (4) show that its interest is not adequately protected by the parties to the action. *See, e.g., Catanzano v. Wing,* 103 F.3d 223, 232 (2d Cir.1996). Failure to meet any one of these require-

7. We do not remand for further proceedings concerning PADC's standing because the law of the case—namely, our decision in this appeal with respect to the individual parties' motion to intervene—would require the District Court to deny PADC's motion to intervene even if PADC were to establish standing. *See North River Ins. Co. v. Philadelphia Reinsurance Corp.,* 63 F.3d 160, 164–65 (2d Cir. 1995), *cert. denied,* 516 U.S. 1184, 116 S.Ct. 1289, 134 L.Ed.2d 233 (1996). Our decision not to remand is consistent with the Supreme Court's opinion in *Steel Co.,* since we are not "assuming jurisdiction for the purpose of deciding the merits," *Steel Co.,* 523 U.S. at 93–95, 118 S.Ct. 1003, but, rather, deciding the merits as to parties with standing.

8. Rule 24(a)(2), on "Intervention of Right," states: "Upon timely application anyone shall be permitted to intervene in an action ... (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately protected by the existing parties."

9. Rule 24(b)(2), on "Permissive Intervention," states: "Upon timely application anyone may

be permitted to intervene in an action ... (2) when an applicant's claim or defense and the main action have a question of law or fact in common.... In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties."

10. Not only do appellants take issue with the Settlement's distinction between those targeted for Nazi persecution "on grounds of race, religion, or personal status," and those targeted on other grounds (*e.g.,* national origin); they also take issue with the suggestion that ethnic Poles were not among those targeted on grounds of race, contending that ethnic Poles, like Jews, "were persecuted because of their membership in a racial group." Appellants' Reply Brief at 4. In other words, appellants object *both* to the exclusion of persons targeted on the grounds of national (*i.e.,* Polish) origin, *and* to the suggestion that ethnic Poles were not considered a "race" (*i.e.,* Slavs) by the Nazis. We defer to the settling parties' distinction between "national origin" and "race" for purposes of this Settlement, reviewing the denial of the motion to intervene without reaching the question of how the Nazis might have categorized their Polish victims.

ments suffices for a denial of the motion. *See id.*

■ A district court has broad discretion in assessing the timeliness of a motion to intervene, which "defies precise definition." *United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 70 (2d Cir.1994). The court may consider, *inter alia,* the following factors: (1) how long the applicant had notice of its interest in the action before making its motion; (2) the prejudice to the existing parties resulting from this delay; (3) the prejudice to the applicant resulting from a denial of the motion; and (4) any unusual circumstance militating in favor of or against intervention. *See id.* Generally, the court's analysis must take into consideration the totality of the circumstances. *See, e.g., Farmland Dairies v. Commissioner of the New York State Dep't of Agric. & Mkts.*, 847 F.2d 1038, 1044 (2d Cir.1988).

A review of the transcript of the November 22 hearing on the motion to intervene reveals that the District Court denied the motion as untimely. The Court focused its timeliness analysis primarily on the second factor, the risk of prejudice to the existing parties, and the third factor, the prejudice that might accrue to the proposed intervenors as a result of a denial of their motion. In assessing the risk of prejudice to the existing parties, the Court also considered the applicants' delay in filing their motion. Finally, the Court took into account the applicants' arguments concerning the asserted inadequate representation by class plaintiffs and conflict of interest of class counsel. We consider these matters in turn.

1. *Applicant's Delay in Filing Motion and Resulting Prejudice to Existing Parties*

■ We have affirmed a denial of a motion to intervene where granting intervention would have jeopardized a settlement. *See, e.g., Pitney Bowes*, 25 F.3d at 72 (explaining that intervention would delay agreed-upon cleanup of Superfund site

and require parties "to begin negotiations again from scratch"). In *Pitney Bowes,* we affirmed the denial of intervention in part because the parties had negotiated for eight months before reaching a final agreement with respect to a proposed consent decree that had been lodged with the District Court, *see id.,* as well as because the applicant's explanations for its delay in filing a motion to intervene were inadequate, *see id.* at 71. The applicant in *Pitney Bowes* had submitted a letter to the District Court opposing the proposed consent decree within one month of learning about it, but had waited another seven months before filing its actual motion to intervene. *See id.* We rejected the explanation that the applicant had delayed because it had been waiting for a response to its letter, noting that the applicant could have filed the motion in the meantime. *See id.* We have also rejected as sufficient justification for a delay in filing a motion to intervene the argument that the delay occurred because the order that triggered the need to intervene came as a "total surprise" to the proposed intervenors. *See Catanzano,* 103 F.3d at 233. In *Catanzano,* we reasoned that the applicants should have known that the issue addressed by the order in question had been "clearly present in the litigation from the very beginning." *Id.*

In the present case, the parties engaged in extensive negotiations, lasting more than a year, before reaching an agreement. Once the parties submitted the written Settlement—with its definition of "Victims or Targets of Nazi Persecution"—appellants waited another eight months before moving to intervene in October 1999. Appellants had been on notice of their arguable interest in this litigation for at least eight months, since they had submitted their letter objecting to the Settlement in February 1999.

Appellants argue that they delayed in filing the motion because their previous attorney discovered a conflict of interest and withdrew from the case in September

or October 1999. This argument fails because the attorney's withdrawal occurred very late and, therefore, does not account for most of the eight months of delay.

Appellants also argue that their delay was due in part to the fact that they were waiting for a response to their letter. As in *Pitney Bowes*, this reason is not a sufficient justification for the delay. *See Pitney Bowes*, 25 F.3d at 71. Appellants would still have had to intervene, and could have filed their motion as they waited for a response, if a response was indeed appropriate.

In short, intervention at this late stage would prejudice the existing parties by destroying their Settlement and sending them back to the drawing board. In light of this prejudice, and of appellants' unjustified delay in submitting their motion, the District Court did not abuse its discretion in denying intervention as of right.

### 2. Prejudice to Applicants

■ Because appellants remain free to file a separate action, they have not established that they will be prejudiced if their motion to intervene is denied. Judge Korman emphasized this point at the hearing, going so far as to encourage them to file the sample complaint that accompanied their motion to intervene.[11] In response, they argue that they would face tremendous obstacles in bringing their own lawsuit, among them: that litigating this issue could take years, during which many elderly plaintiffs might pass away; that the goals of judicial economy and uniformity of decisions militate against duplicating the efforts of existing plaintiffs and proceeding separately; and that defendants presented numerous substantial defenses prior to settling and would not face the same public pressure to abandon those defenses and settle as they faced in the instant lawsuit.

These potential obstacles to the pursuit of an independent lawsuit do not "impair or impede the applicant's ability to protect [its] interest," FED. R. CIV. P. 24(a)(2), to an extent warranting intervention as of right. *See, e.g., SEC v. Everest Management Corp.*, 475 F.2d 1236, 1239 (2d Cir.1972). In *Everest Management*, we rejected the argument that the proposed intervenors would be prejudiced by a denial of their motion because "they [would] be required to bear the financial burden of duplicating the SEC's efforts; and, not having the SEC's investigative staff and resources available to them, they [might] be unable to develop as complete and reliable a record." *Id.* Similarly, the fact that appellants in this case will face many significant obstacles if they file their own lawsuit does not as a matter of law require their intervention.

We conclude, in sum, that Judge Korman's determination that proposed intervenors would not be unduly prejudiced by a denial of their motion to intervene did not constitute an abuse of discretion.

### 3. Inadequate Representation and Conflict of Interest

■ In rejecting the applicants' claim of inadequate representation, Judge Korman explained that the settlement amount was based on an estimate of the assets of European Jews that flowed into Swiss banks during the period of Nazi rule and, consequently, that it made sense to direct the settlement offer primarily to Jewish victims and their heirs. In addition, he questioned the relevance of the broad language of the original complaints (in which the applicants now insist they were included) for purposes of determining whether intervention must be granted. We consider appellants' claim of inadequate representation in some detail because it raises a

---

11. As the hearing concluded, Judge Korman stated: "I think what you ought to do is take this complaint and file it in the Clerk's Office as a free standing complaint." A few moments later, he reiterated, "[Y]ou can file your complaint right now in the Clerk's office and proceed."

question not previously addressed by this Court.

The thrust of appellants' inadequate representation argument is that class counsel used the threat of a lawsuit brought on behalf of broadly defined "worldwide" classes to obtain the greatest possible offer from defendants, and subsequently narrowed the class drastically in order to secure the greatest possible recovery for a smaller group of plaintiffs. Appellants argue that this alleged maneuver not only amounts to inadequate representation by class plaintiffs, but also suggests the existence of a conflict of interest on the part of class counsel, because some of the attorneys for the class in the instant case represent ethnic Poles—as defined by the parties herein—in other related litigation, where a similar "Victims or Targets" category has included ethnic Poles.

These arguments rely principally on the notion that the broad language of the original complaint in a class action lawsuit vests in putative class members—that is, those who *seem* to be included in the class described in the complaint—a right to be included in the class ultimately certified by the District Court. Appellants' inadequate representation claim is somewhat unusual, for, as they acknowledge, "normally the concern is that class counsel may unfairly bind the interests of *absent* class members"—that is, those ultimately *included* in the class and thereby barred from future lawsuits. Appellants' Brief at 24 (emphasis added). However, appellants cite three cases from other federal courts in support of the proposition that they are "not the first putative class members to complain that they have been excluded from a class

settlement unfairly, as a result of the narrowing of the class." *Id.* at 26 (citing *In re Fine Paper Antitrust Litig.*, 695 F.2d 494 (3d Cir.1982); *In re Records and Tapes Antitrust Litig.*, 118 F.R.D. 92 (N.D.Ill. 1987); *In re Chicken Antitrust Litig.*, 560 F.Supp. 943 (N.D.Ga.1979)).[12] In response, appellees assert that a complaint's "[a]spirational language describing a proposed class creates no such rights or duties." Appellees' Brief at 38.

It appears that our Court has not previously addressed the question of whether the broad language of the original complaint in a class action lawsuit may vest in putative class members a right to remain a part of the class upon certification. However, two Third Circuit cases that have spoken to this question, as well as the language of Federal Rule of Civil Procedure 23(c)(1) and the case law on intervention generally, do not lend support to appellants' suggestion that their apparent inclusion in the complaint entitles them to be a part of the class ultimately certified.[13]

The Third Circuit's opinion in *In re Fine Paper* sheds some light on the issue. There, the Court addressed a somewhat different contention on the part of the proposed intervenors, who argued *not* that a certification order had wrongly excluded them, but that the language of the order was *ambiguous* and should be interpreted to include them. *See In re Fine Paper*, 695 F.2d at 498. (The proposed intervenors had been excluded from the plaintiff class because they were defendants in another, related lawsuit. *See id.* at 497.) The Third Circuit rejected their argument, holding that the certification order was

---

**12.** Appellants also quote a passage from *In re GM Trucks Litigation*, 55 F.3d 768 (3d Cir. 1995), on the risks of beginning settlement negotiations before certifying the class. However, that case concerned the more traditional situation in which absent class members, who are barred from bringing future lawsuits, allege that they have been inadequately represented.

**13.** The opinions in *In re Records and Tapes Antitrust Litigation* and *In re Chicken Antitrust Litigation* are inapposite. In both of these cases, the issue was whether to include in the plaintiff class certain entities that were subsidiaries, affiliates, or owners of a defendant, where such entities would have been part of the plaintiff class but for their connections to a defendant. *See In re Records and Tapes*, 118 F.R.D. at 93–96; *In re Chicken*, 560 F.Supp. at 949–51.

clear and did not include them. *See id.* at 499. To the extent that *In re Fine Paper* is relevant here, it supports the view that the District Court has broad discretion in certifying the class—for, having established that the certification order was "clear and understandable," the Court did not then examine whether the order *should* have included the proposed intervenors, deferring instead to the District Court's discretion regarding certification. *See id.* at 498.

An earlier appeal in the *In re Fine Paper* litigation had rejected a putative class member's objection to a certification order that had "carv[ed] out" a much smaller class than the one described in the original complaint. *See In re Fine Paper*, 632 F.2d 1081, 1087 (3d Cir.1980). In that case, the Third Circuit acknowledged that an unclear certification order had left the claims of the objector and other putative class members "in suspended animation," and therefore found that the order dismissing the settling defendants had to wait until the Court ruled on whether to certify a separate class that could proceed with its own action. *Id.* at 1087–88. However, the Court held that the narrowing of the original class was not a reason to create an "exception to the general rule that a nonsettling party may not object to the terms of a settlement which do[es] not affect its own rights." *Id.* at 1087. We view the opinion of the Third Circuit as standing for the proposition that a certification order may exclude putative class members as long as they remain free to bring their own lawsuit. *Cf. id.* at 1088 ("The claims of ... putative members of the national class may not be overlooked.").

Our conclusion is consistent with the language of Rule 23 and the case law on intervention. Rule 23 gives the District Court broad discretion to modify the definition of the class even *after* certification, *see* FED. R. CIV. P. 23(c)(1) ("[A certification] order under this subdivision may be conditional, and may be altered or amended before the decision on the merits."),

while the case law on intervention sets forth the multi-factor analysis outlined above, which does not require a court even to consider the language of the original complaint when assessing a motion to intervene. *See, e.g., Catanzano,* 103 F.3d at 232; *New York News,* 972 F.2d at 485; *Farmland Dairies,* 847 F.2d at 1043–44.

In light of these considerations, appellants in the instant case cannot demonstrate that they have been inadequately represented by asserting that they were "excluded" from a class to which they originally belonged. While it is true that the language of the original complaints describes the class broadly, and that the "Agreement in Principle" referred to "the worldwide classes delineated in the complaints," it is also true, as the District Court stated, that the broad language of these complaints is simply not relevant to the decision concerning whether to grant a motion to intervene. Once the District Court exercised its discretion in certifying a class, the broad language of the complaints did not create an "exception to the general rule that a nonsettling party may not object to the terms of a settlement which do[es] not affect its own rights." *In re Fine Paper,* 632 F.2d at 1087. The nonparty's only recourse is to file a motion to intervene, and the evaluation of such a motion does not require a court to take into account the language of the original complaint.

It bears emphasis that appellants' inadequate representation and conflict of interest claims also contradict Judge Korman's statements at the hearing on their motion to intervene. As noted above, Judge Korman explained that the Settlement amount does not account for the losses of a "worldwide class" but, rather, reflects a calculation of Jewish assets transferred into Swiss banks during the relevant period. As a result, the Settlement offer is properly directed primarily to Jewish victims and their heirs. Class counsel have not excluded appellants from a settlement offer based on an estimate of funds that includes

the losses of ethnic Poles. Instead, the parties have justifiably limited the class to those whose losses are reflected in the Settlement amount.[14]

■ In sum, we hold that the broad language of a complaint in a class action lawsuit does not vest in putative class members a right to be part of the class ultimately certified by the District Court. In the instant case, the District Court acted well within its discretion in denying appellants' motion to intervene because their motion was not timely filed. There is no basis on this record to question Judge Korman's conclusion that intervention would prejudice the existing parties by destroying their Settlement. Appellants, in turn, have failed to show that they were inadequately represented at any time, or that their ability to protect their interests will be impaired by a denial of their motion, inasmuch as they remain completely free to pursue their claims on their own.

### B.

■ A district court may grant a motion for permissive intervention if the application is timely and if the "applicant's claim or defense and the main action have a question of law or fact in common." Fed. R. Civ. P. 24(b)(2). The court must consider whether granting permissive in-

tervention "will unduly delay or prejudice the adjudication of the rights" of the existing parties. *Id.*

As discussed above, in this case Judge Korman found that intervention would prejudice the adjudication of the rights of the existing parties by destroying their Settlement, and we find nothing to suggest, much less demonstrate, that he abused this discretion in denying permissive intervention on these grounds.

■ Appellants insist that they ought to be permitted to intervene at least to state their objections to the Settlement. However, the District Court has discretion to deny this request, particularly where, as in this case, the proposed intervenors have already had an opportunity to state their objections before the Court. *See Pitney Bowes*, 25 F.3d at 73 (denying intervention as of right and by permission where the applicant wishing to challenge the fairness of a consent decree had already presented its objections at a fairness hearing).

### IV.

In closing, we briefly address appellants' strongly stated concern that their exclusion from this Settlement will promote the "historically incorrect view" that ethnic Poles were not victims of Nazi persecution. An *amicus curiae* brief submitted to this

---

14. Appellants draw attention to the Settlement's inclusion of groups whose losses apparently do not form part of this estimate—that is, those who fall under the categories of Romani, Jehovah's Witnesses, homosexuals, and the disabled—and suggest that it implies suspect motivations. *See* Appellants' Brief at 25 ("[C]lass plaintiffs took the more expedient route of dropping some of the more numerous classes from the consolidated complaints in defining the settlement classes." (footnote omitted)). The inclusion of these groups arguably calls into question appellees' argument that ethnic Poles have been excluded because the Settlement amount does not reflect their losses. Nevertheless, we are not persuaded that appellants have been inadequately represented. Counsel for appellees explained at oral argument that the inclusion of these smaller groups represents a decision on the part of plaintiffs to include those groups treat-

ed "essentially indistinguishably from Jews" under the Nuremberg race laws. Putting aside the question of the parties' motivations, we note that the groups in question presumably encompass far fewer claimants than the category of ethnic Poles (and certainly fewer than the broader category of persons persecuted on the basis of national origin, who would undoubtedly seek to be included if ethnic Poles succeeded in intervening). Under Rule 24 the inclusion of much smaller groups could well be warranted on the ground that their ability to pursue their interest in the subject matter of this litigation would otherwise be impaired. Moreover, it would be up to class members—not potential intervenors— to challenge the Settlement's allocation of funds. In any event, we discern no basis for questioning the motives of the class representatives or their counsel.

Court by the Federation of Polish Americans is devoted entirely to refuting this misconception with an account of Polish suffering during the Second World War. As should be clear from the discussion above, neither the District Court's denial of the motion to intervene, nor our refusal to disturb the District Court's ruling, reflects any view whatsoever with regard to this matter, and certainly should not be understood as a denial of the suffering of the non-Jewish people of Poland under Nazi attack and occupation.

## V.

For the reasons stated above, we affirm the order of the District Court. Each party shall bear its own costs. *See* FED. R.APP. P. 39(a).